## HOLLOWAY v. UNITED STATES.

### No. 8822.

United States Court of Appeals District of Columbia.

Argued Jan. 17, 1945.

Decided Feb. 26, 1945.

Mr. George E. C. Hayes, of Washington, D. C. (appointed by District Court), for appellant.

Mr. Charles B. Murray, Assistant United States Attorney, of Washington, D. C. with whom Messrs. Edward M. Curran, United States Attorney, and John P. Burke, Assistant United States Attorney, both of Washington, D. C., were on the brief, for appellee.

Before GRONER, Chief Justice, and MILLER and ARNOLD, Associate Justices.

ARNOLD, Associate Justice.

The appellant was convicted of rape. He appeals on the sole ground that the record discloses such substantial doubt of his sanity that the verdict should be set aside. It appears that for years prior to the crime defendant was suffering from mental disease and was an abnormal psychopathic personality. In 1940 he was held in Gallinger Hospital for mental observation. Later he was confined in the United States Medical Center for Federal Prisoners as a mental case. In the fall of 1943 he was again committed to Gallinger Hospital as a mental patient. He was released, not as recovered, but in the custody of his mother with directions for the treatment of the mental disorders from which he was suffering. Some months after this release he raped two women on the same day.[1]

At the trial two psychiatrists, one on the

---

[1] No evidence of the second offense was given at the trial. However, for the purpose of examining the experts as to defendant's sanity counsel stipulated as to a hypothetical question referring to both acts.

staff of Gallinger Hospital and the other a member of the Commission on Mental Health, both testified that the defendant was of unsound mind and at the time of the offense could not tell right from wrong. A third psychiatrist, while admitting that the defendant was a constitutional psychopath, testified that his condition did not amount to a psychosis and that he was able to tell right from wrong. On cross examination this witness admitted that when he examined the defendant he did not know his previous mental record.[2] The government offered in evidence the record of a lunacy inquisition of the sanity of the appellant, held approximately a month and a half prior to the trial, wherein the jury found he was of sound mind at that time.

■ In a criminal trial where insanity is put in issue, the burden is on the accused to overcome the presumption of sanity by evidence sufficient to create a reasonable doubt as to his mental capacity to commit the offense.[3] When that is done, the burden is on the prosecution to establish the sanity of the accused. In such a situation the jury must be instructed that in order to convict they must believe beyond a reasonable doubt that the defendant was sane at the time of the offense.[4] It is argued that the facts in this case are such that no jury could convict if it properly followed such an instruction.

■ Had there been an equivalent conflict of testimony about the actual commission of the offense it might well be that the verdict could not stand. But the issue of the criminal responsibility of a defendant suffering from mental disease is not an issue of fact in the same sense as the commission of the offense. The ordinary test of criminal responsibility is whether defendant could tell right from wrong.[5] A slightly broader test is whether his reason had ceased to have dominion of his mind to such an extent that his will was controlled, not by rational thought, but by mental disease.[6] The application of these tests, however they are phrased, to a borderline case can be nothing more than a moral judgment that it is just or unjust to blame the defendant for what he did. Legal tests of criminal insanity are not and cannot be the result of scientific analysis or objective judgment. There is no objective standard by which such a judgment of an admittedly abnormal offender can be measured. They must be based on the instinctive sense of justice of ordinary men. This sense of justice assumes that there is a faculty called reason which is separate and apart from instinct, emotion, and impulse, that enables an individual to distinguish between right and wrong and endows him with moral responsibility for his acts. This ordinary sense of justice still operates in terms of punishment. To punish a man who lacks the power to reason is as undignified and unworthy as punishing an inanimate object or an animal. A man who cannot reason cannot be subject to blame. Our collective conscience

---

[2] This was stated by counsel for appellant. It does not appear in the narrative account of the proceedings certified by the trial judge.

[3] Davis v. United States, 1895, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499.

[4] Davis v. United States, supra, note 3; Matheson v. United States, 1913, 227 U.S. 540, 33 S.Ct. 355, 57 L.Ed. 631; Davis v. United States, 1911, 37 App.D.C. 126. The courts are divided as to which party has the burden of proof. For statements of the various views, see 9 Wigmore, Evidence (3rd Ed., 1940), § 2501; Wharton's Criminal Law (12th Ed., 1932), §§ 79 and 80.

[5] United States v. Guiteau, 1882, 1 Mackey 498, 12 D.C. 498, 10 F. 161, 168, 47 Am.Rep. 247; Wharton's, op. cite, supra note 4, § 52.

[6] The following instruction is typical of this test: "To excuse an act because of insanity the degree of insanity must be shown to have been sufficiently great to have controlled the will power of the defendant at the time the act was committed. When reason ceases to have dominion over the mind, proven to be diseased and the person reaches a degree of insanity where criminal responsibility ceases, accountability to the law for the purpose of punishment no longer exists. The issue upon that point is, was the defendant's brain impaired to such an extent that he was incapable of forming a criminal intent, and that his mind was not under his control by reason of this infirmity, and his brain was compelled to it, that the time his will power, judgment, reflection, and control of his mental faculties was impaired, so that at the time he could not distinguish between right and wrong, or that the act was done under pressure of an irresisible, and uncontrollable impulse at the time." United States v. Fore, D.C.S.D. Cal.1941, 38 F.Supp. 140, 141; Hotema v. United States, 1902, 186 U.S. 413, 419, 22 S.Ct. 895, 46 L.Ed. 1225.

does not allow punishment where it cannot impose blame.

The modern science of psychology is concerned with diagnosis and therapeutics and not with moral judgments. It proceeds on an entirely different set of assumptions. It does not conceive that there is a separate little man in the top of one's head called reason whose function it is to guide another unruly little man called instinct, emotion, or impulse in the way he should go. The tendency of psychiatry is to regard what ordinary men call reasoning as a rationalization of behavior rather than the real cause of behavior. From this point of view psychiatrists probe behind what ordinary men call the "reasoning" of an abnormal personality. This tends to restrict the area of moral judgment to an extent that offends our traditional idea that an offender who can talk and think in rational terms is morally responsible for what he does.

 And so it is that when psychiatrists attempt on the witness stand to reconcile the therapeutic standards of their own art with the moral judgment of the criminal law they become confused. Thus it is common to find groups of distinguished scientists of the mind testifying on both sides and in all directions with positiveness and conviction. This is not because they are unreliable or because those who testify on one side are more skillful or learned than those who testify on the other. It is rather because to the psychiatrist mental cases are a series of imperceptible gradations from the mild psychopath to the extreme psychotic, whereas criminal law allows for no gradations. It requires a final decisive moral judgment of the culpability of the accused. For the purposes of conviction there is no twilight zone between abnormality and insanity. An offender is wholly sane or wholly insane.

A complete reconciliation between the medical tests of insanity and the moral tests of criminal responsibility is impossible. The purposes are different; the assumptions behind the two standards are different. For that reason the principal function of a psychiatrist who testifies on the mental state of an abnormal offender is to inform the jury of the character of his mental disease. The psychiatrist's moral judgment reached on the basis of his observations is relevant. But it cannot bind the jury except within broad limits. To command respect criminal law must not offend against the common belief that men who talk rationally are in most cases morally responsible for what they do.

 The institution which applies our inherited ideas of moral responsibility to individuals prosecuted for crime is a jury of ordinary men. These men must be told that in order to convict they should have no reasonable doubt of the defendant's sanity. After they have declared by their verdict that they have no such doubt their judgment should not be disturbed on the ground it is contrary to expert psychiatric opinion. Psychiatry offers us no standard for measuring the validity of the jury's moral judgment as to culpability. To justify a reversal circumstances must be such that the verdict shocks the conscience of the court.

Affirmed.