**UNITED STATES of America, Plaintiff,**

v.

**James FIELDING, Defendant.**
**Cr. No. 299-54.**

United States District Court
District of Columbia.
Jan. 15, 1957.

I. Judge Learned Hand, speaking for the court in United States v. Rebhuhn, 2 Cir., 1940, 109 F.2d 512, 514.

Oliver Gasch, U. S. Atty., and Arthur McLaughlin, Asst. U. S. Atty., for the District of Columbia.

Charles B. Sullivan, Jr., Washington, D. C., for defendant.

HOLTZOFF, District Judge.

This case is before the Court on the defendant's motion for judgment notwithstanding the verdict, which would adjudge the defendant not guilty on the ground of insanity.

The defendant was tried on a charge of murder in the first degree. That he committed the homicide was not denied. He contended, however, first, that the homicide did not amount to murder in the first degree; and, second, that he was insane when it was committed. The court instructed the jury that it had a right to return any one of four verdicts: guilty of murder in the first degree, as charged; guilty of murder in the second degree; guilty of manslaughter; not guilty on the ground of insanity; or, not guilty. It should be observed that under the District of Columbia Code, if the defendant in a criminal case is acquitted on the sole ground that he was insane at the time of the commission of the offense, this fact must be set forth by the jury in its verdict.[1] If such a verdict is returned, it becomes mandatory on the court to order the defendant confined in a hospital for the mentally ill. In that event, the defendant may be released from the institution by an order of the court issued on the basis of a certificate of the Superintendent of the hospital to the effect that the defendant has recovered his sanity; that in the opinion of the Superintendant the defendant will not in the reasonable future be dangerous to himself or others; and that he is entitled to unconditional release. The jury in the instant case found the defendant guilty of murder in the second degree.

Counsel for the defendant now moves for judgment notwithstanding the verdict that would direct an acquittal on the ground of insanity. This motion was apparently suggested by the opinion of the Court of Appeals for this Circuit in Douglas v. United States, 239 F.2d 52, 59. The court indicated, however, that its decision should be deemed limited to the facts of that case, for it stated in its opinion that, "Each case must be decided upon its own facts". Moreover, the court recognized the existence of a constitutional question, but said that under the situation existing in that case, the suggested constitutional question need not be decided. The court tentatively ex-

1. D.C.Code, § 24–301, as amended August 9, 1955.

plored possible solutions of the problem,[2] but did not make a definitive ruling on this point. In view of these circumstances, the entire subject seems open for consideration. Because of its comparative novelty and the unusual character of the defendant's application, a detailed study and discussion seem appropriate.

While the written motion before the court purports to seek a judgment of acquittal notwithstanding the verdict, counsel orally amended and limited his motion at the time of argument so as to pray for an acquittal solely on the ground of insanity. Counsel for the defendant also affirmatively stated at the oral argument that he did not request a new trial in the alternative, since he did not desire to subject the defendant to the risk of being found guilty of murder in the first degree.[3]

A consideration of the defendant's motion involves three aspects: first, the precise issue of fact relating to mental competency to be determined by the jury; second, the evidence in this case bearing on this issue; and, third, procedural problems.

 Modern penal law is founded on moral culpability.[4] The law punishes a person for a criminal act only if he is morally responsible for it. To do otherwise would be both inhumane and unenlightened. As was said in Holloway v. United States, 80 U.S.App.D.C. 3, 5, 148 F.2d 665, 666, "Our collective conscience does not allow punishment where it cannot impose blame." It is this fundamental principle that exempts from punishment certain types of insane criminals.

A difficult problem invariably arises in endeavoring to formulate a sound, practical definition of legal insanity. Obviously there are many mentally abnormal, subnormal, or defective persons, who should be held responsible for a crime that they commit. For example, a person with a psychopathic personality, or, to use a more recent scientific term, a person with a sociopathic personality, is subject to punishment for his criminal acts, and yet he is not a normal person. So, too, there may be mentally abnormal persons who may be deemed culpable in the case of some crimes, but not in respect to others. Again, insane persons may have lucid intervals, as well as what are called technically "periods of remission", that is periods during which their sanity is temporarily restored and, naturally, they should be considered punishable for a crime committed during those times. The perennial task of devising a definition or a series of definitions of legal insanity that would properly differentiate between those mentally abnormal persons who should be held responsible for their crimes and those who should not be considered blameworthy, is manifestly no easy or simple matter. First, a line of demarcation must be drawn where it would attain a proper balance between the needs of protection of the public, and fairness and justice to the accused. We must take as our guiding star the celebrated precept so aptly framed by Mr. Justice Cardozo: [5]

> " * * * justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true."

Second, the tests must be couched in non-technical phraseology, not necessarily with scientific precision, in order that they may be understood and be susceptible of practical application by judg-

---

2. Douglas v. United States, supra, footnote 2.

3. Counsel for the defendant stated that he had in mind the predicament of the defendant in a recent case in which a conviction of murder in the second degree was reversed and a new trial was granted, and at the second trial the jury found the defendant guilty of murder in the first degree. United States v. Green, 95 U.S.App.D.C. 45, 218 F.2d 856; and 98 U.S.App.D.C. 413, 236 F.2d 708.

4. Jerome Hall, General Principles of Criminal Law, p. 168.

5. Snyder v. Commonwealth of Massachusetts, 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674.

es and jurors, who naturally are not psychiatrists. Some psychiatrists perhaps at times overlook the fact that such definitions are not addressed to them and are not intended primarily for their use, but are designed as pragmatic and helpful guides for judges and jurors, who have no background in psychiatric science. A definition may be perfectly accurate and yet be useless in the criminal law, if it is framed in purely scientific terms that would be comprehended by a technician, but may not be easily understood by the layman.

Any comprehensive discussion of the issue of fact to be determined by the jury, must commence with M'Naghten's Case, 10 Clark & Finnelly 200, 8 Eng. Rep. 718, decided by the House of Lords in 1843. In that opinion the following rule was enunciated:

> " * * * to establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong.
> * * * "

The following additional principle was also announced:

> "The fourth question which your Lordships have proposed to us is this:—'If a person under an insane delusion as to existing facts, commits an offence in consequence thereof, is he thereby excused?' To which question the answer must of course depend on the nature of the delusion: but, making the same assumption as we did before, namely that he labours under such partial delusion only, and is not in other respects insane, we think he must be considered in the same situation as to responsibility as if the facts with respect to which the delusion exists were real. For example, if under the influence of his delusion he supposes another man to be in the act of attempting to take away his life, and he kills that man, as he supposes, in self-defence, he would be exempt from punishment."

For many years the doctrines of M'Naghten's Case were universally followed. In 1870, however, an exception arose in New Hampshire where the appellate court approved a general instruction given by the trial judge in a homicide case merely to the effect that whether the defendant had a mental disease, and whether the killing was the product of such disease, were questions of fact for the jury, State v. Pike, 49 N.H. 399, 407–408. For a long time New Hampshire stood in solitary isolation on this point. A search of the authorities fails to disclose that any other jurisdiction ever followed the New Hampshire case prior to 1954,—a period of eighty-four years. In 1954 the District of Columbia reverted to the New Hampshire doctrine, as will be shown hereafter.

With the progress of psychiatry, the view gradually developed in some quarters that there were categories of insanity not comprised within either of the two formulas of M'Naghten's Case, but that should receive consideration in criminal law. Accordingly, an additional definition of insanity evolved. The test applicable to this new group of cases has received the picturesque and somewhat inaccurate appellation of "irresistible impulse". The term "impulse" as used in this connection may be too narrow and perhaps misleading. This additional test is whether the defendant was suffering from a mental disease that rendered him unable to control his will and to adhere to the right, even though, he may have known the difference between right and wrong. If so, he should not be held responsible for a crime committed by him. For the Federal courts this new criterion was approved in Davis v. United States, 165 U.S. 373, 378, 17 S.Ct. 360, 362, 41 L.Ed. 750. There the Supreme Court lent its sanction to the following definition of insanity:

> "The term 'insanity,' as used in this defense, means such a perverted

and deranged condition of the mental and moral faculties as to render a person incapable of distinguishing between right and wrong, or unconscious at the time of the nature of the act he is committing, *or where, though conscious of it, and able to distinguish between right and wrong, and know that the act is wrong, yet his will—by which I mean the governing power of his mind—has been otherwise than voluntarily so completely destroyed that his actions are not subject to it, but are beyond his control."* (Emphasis supplied.)

In the District of Columbia, the doctrine of the Davis case was expressly applied in Smith v. United States, 59 App.D.C. 144, 36 F.2d 548, 70 A.L.R. 654, and was consistently followed since that time.

■ In 1954, the Court of Appeals for the District of Columbia, in Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430, exhaustively reconsidered the subject and accepted in substance the vague standard that had been approved in New Hampshire in 1870, to the effect that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect. The New Hampshire test and that adopted in the Durham case are precisely the same, except that the Durham case extended it to include mental defects; whereas the New Hampshire doctrine seems to have been originally limited to mental diseases. In the Durham case, the court ruled that in criminal cases in which the issue of mental competency arises, the jury should be instructed in accordance with this general formula, and reversed a conviction because the issue had been determined at the trial in accordance with the two definitions previously adopted by the Federal courts.[6] The Court of Appeals explained, however, that the new criterion is not to supersede the two earlier standards, but is to be supplemental to them. In other words, the jury is to be instructed as to all three tests: whether the defendant was able to distinguish between right and wrong; whether the defendant was able to adhere to the right and to refrain from doing wrong; or whether the defendant was suffering from a mental disease or defect and the act in question was the product of such disease or defect. If the defendant's offense were found to have been an insane act by the application of any one of these three tests, he would be entitled to a verdict of not guilty on the ground of insanity, Durham v. United States, 94 U.S. App.D.C. 228, 242, 214 F.2d 862, 45 A.L.R.2d 1430; Douglas v. United States, D.C.Cir., 239 F.2d 52. In the case at bar the jury was instructed in accordance with these views.

A close analysis of the formula announced in State v. Pike, and Durham v. United States, supra, leads to the query whether it actually expands the other definitions or whether it merely substi-

---

6. The subsequent history of the Durham case may be of interest. Durham was retried before another judge and a jury, and the jury was instructed in accordance with the new test. The defendant was again convicted, but the second conviction was reversed, D.C.Cir., 237 F.2d 760, because in informing the jury that a verdict of not guilty on the ground of insanity would result in the defendant's mandatory commitment to a mental institution, (it having been stated by the Court of Appeals that such information should be given to the jury, Taylor v. United States, 95 U.S.App.D.C. 373, 378, 222 F.2d 398) the trial judge added that opinions of psychiatrists indicated that the defendant might be released therefrom very shortly if committed there. On the eve of the third trial the defendant pleaded guilty. By pleading guilty, he, of course, admitted that he was not insane at the time of the commission of the offense, since a plea of guilty confesses every element of the Government's case, and the burden of proof is on the Government to establish mental competency, if it is properly called in question. The judge who accepted the plea interrogated the defendant searchingly, in order to make it clear that the defendant understood the effect of his plea.

tutes a new manner of stating what may be called the test of "inability to adhere to the right". If the test of insanity in criminal law is whether the crime is a product of a mental disease or a mental defect, the result would seem to be the same as it would be if the criterion were whether the defendant by reason of mental disease or mental defect was unable to adhere to the right and to refrain from doing wrong.[7] It may perhaps be said that an act committed by a person who though suffering from some mental abnormality is, nevertheless, able to distinguish between right and wrong, and whose will has not been so over-powered as to prevent him from adhering to the right, can hardly be deemed the product of a mental disease or a mental defect. In one sense it may be argued that the two tests are interchangeable. The basic difference between them is that the Pike and Durham formula is couched as an abstract, indefinite generality, which accords a greater freedom and range to scientific speculation and inquiry, and does not impose on expert witnesses a duty of precision of thought or statement; whereas the other standard is a concrete proposition that a layman can apply, and which offers a more or less definite guide, insofar as any guide is possible in this abstruse field.[8]

■■ On the question of burden of proof, the Federal rule is that insanity is not an affirmative defense, but that mental competency to commit the offense is one of the elements of the crime, and that, consequently, the onus is on the Government to establish it. Necessarily, this burden must be sustained by proof beyond a reasonable doubt. To be sure, sanity is presumed unless called into question. On the other hand, if evidence of insanity is introduced by the defendant, the presumption vanishes and the Government is then charged with the duty of going forward with the evidence and proving mental competency in order to sustain the general burden resting upon it, Davis v. United States, 160 U.S. 469, 485 et seq., 16 S.Ct. 353, 40 L.Ed. 499; Holloway v. United States, 80 U.S. App.D.C. 3, 4, 148 F.2d 665; Tatum v. United States, 88 U.S.App.D.C. 386, 190 F.2d 612. It was held in the Holloway case that if insanity is put in issue at a criminal trial, the duty is first on the accused to overcome the presumption of sanity by evidence sufficient to create a reasonable doubt as to his mental capacity and that when this is done, the burden rests on the Government to establish his sanity beyond a reasonable doubt. On the other hand in the Tatum case, supra, the conclusion was reached that if only some evidence of mental disorder is introduced, the Government is required to prove mental capacity beyond a reasonable doubt. In the case at bar the jury was instructed that the burden of proof was on the Government to establish beyond a reasonable doubt the defendant's mental competency to commit the crime.

■■ This brings us to a consideration of the respective functions of the court and the jury in connection with the issue of mental capacity. Whether the defendant was mentally competent to

---

7. On the same state of facts, the jury at the second Durham trial using the Pike and Durham formula, arrived at the same conclusion as the court at the first trial using the other two definitions.

8. The Court of Appeals for the Fifth Circuit, Howard v. United States, 232 F.2d 274; the Court of Appeals for the Ninth Circuit, Andersen v. United States, 237 F.2d 118, 127; and the Court of Military Appeals, United States v. Kunak, 5 U. S. Court of Military Appeals 346, 354 et seq., have expressly declined to follow the Durham case.

The following States have likewise expressly declined to follow it:

Maryland, Thomas v. State, 206 Md. 575, 584–585, 588, 112 A.2d 913; Montana, State v. Kitchens, Mont., 286 P.2d 1079, 1082; California, People v. Ryan, 140 Cal.App.2d 412, 295 P.2d 496, 504; and Indiana, Flowers v. State, Ind., 139 N.E.2d 185.

An exhaustive search fails to disclose any jurisdiction other than New Hampshire and the District of Columbia that has accepted the test formulated in the Pike and Durham cases.

commit the crime is a question of fact to be determined by the jury. It is an elementary principle that if the defendant moves for judgment of acquittal at the close of the evidence, or later for judgment notwithstanding the verdict, the evidence must be viewed from the standpoint most favorable to the Government, and that it must be assumed *arguendo* that the testimony introduced in behalf of the Government is true. Such matters as determination of the credibility of witnesses, the weighing of the evidence, and the drawing of justifiable inferences of fact from proven facts, are within the functions of the jury. The motion may be granted only if the court is of the opinion that "there is no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt" * * *, Curley v. United States, 81 U.S.App.D.C. 389, 392–393, 160 F.2d 229, 232.

On the issue of mental capacity an even broader scope is given to the jury than as to other questions of fact. It was said by Judge Arnold in Holloway v. United States, 80 U.S.App.D.C. 3, 4, 148 F.2d 665, 666:

"* * * the issue of the criminal responsibility of a defendant suffering from mental disease is not an issue of fact in the same sense as the commission of the offense. * * * The application of these tests, however they are phrased, to a borderline case can be nothing more than a moral judgment that it is just or unjust to blame the defendant for what he did. Legal tests of criminal insanity are not and cannot be the result of scientific analysis or objective judgment."

In Durham v. United States, 94 U.S. App.D.C. 228, 242, 214 F.2d 862, 876, 45 A.L.R.2d 1430, the same theory was reiterated as follows:

"Finally, in leaving the determination of the ultimate question of fact to the jury, we permit it to perform its traditional function which, as we said in Holloway, is to apply 'our inherited ideas of moral responsibility to individuals prosecuted for crime * * *.' Juries will continue to make moral judgments, still operating under the fundamental precept that 'Our collective conscience does not allow punishment where it cannot impose blame.'"

In the case at bar, the evidence bearing on the issue of mental competency may be summarized as follows. The homicide was committed early on February 5, 1954, and the defendant was arrested several hours later. At the trial the defense called three Government psychiatrists as expert witnesses. The first, who was connected with the District of Columbia General Hospital, examined the defendant at the District of Columbia Jail in April, about two months after the commission of the crime. He expressed the opinion that at the time of his examination the defendant was insane. He further stated, however, that he could form no opinion as to defendant's mental capacity on the date of the crime,—two months earlier. The other two psychiatrists, both associated with Saint Elizabeths Hospital for the mentally ill, examined the defendant in May,—three months after the commission of the offense. Each of these two doctors expressed the opinion that the defendant was insane at the time of the examination, that he had been insane three months earlier when the crime was committed, and that the crime was the product of mental disease. One of them also testified that the defendant had been unable to distinguish right from wrong, or to adhere to the right.

The factual testimony, insofar as it bears on the issue of mental competency, warranted the jury in finding the following facts. The defendant and his wife were living in New Jersey. They had had frequent disagreements. On the evening of February 4, 1954, when the defendant returned home from work, he found that his wife had left and had taken with her some of his belongings. He surmised that she had gone to Washington to stay with her uncle and aunt,

as she had done on prior occasions. He decided to follow her in order to retrieve his property. He armed himself with a revolver and drove to Washington, a distance of a couple of hundred miles. He had no difficulty in finding his way and did not deviate from his route. On reaching Washington he visited his brother for a couple of hours. They had an entirely rational, social conversation. He then drove to the vicinity of the home of his wife's uncle, who is the deceased named in the indictment. He arrived there about 12:30 in the morning, knowing that this was the time when the deceased was in the habit of coming home from his employment. He reached the door of the house of the deceased simultaneously with the arrival of the latter, and insisted on being informed of his wife's whereabouts and on a return of his belongings. He followed the deceased into the house and persisted in his questions. The deceased asked him to leave because of the lateness of the hour and suggested that he might return the next day. The defendant replied that he had to be at work the following day and wanted to get his belongings and then to drive back to New Jersey. The deceased then ordered him to leave and threatened to put him out. At that moment the defendant pulled out his revolver and fired several shots at the deceased, which proved fatal. He then went upstairs and after a conversation with the wife of the deceased shot her, but not fatally. At the trial the defendant testified that the revolver went off accidentally in the scuffle and that he did not fire it.

The defendant then departed, went back to his automobile and started to drive back home to New Jersey. He had no difficulty in finding his way. Two or three hours later, while on the New Jersey Turnpike, he stopped at a restaurant to get something to eat, and while there he was apprehended by the New Jersey State Police, as a radio alarm had been broadcast for him. The next morning he was briefly questioned by the New Jersey officers at the Police Barracks,

and then was taken to the office of the local county prosecutor, where he was interrogated at considerable length. The questions and answers were recorded stenographically and a complete transcript of the proceedings was available at the trial. It showed that the defendant answered all questions logically, rationally, and freely. Later in the day officers of the Metropolitan Police Department of Washington, D. C., arrived in order to take custody of the defendant. He was brought before a magistrate, waived extradition, and consented to return to Washington, voluntarily. He was taken back by the Washington police officers in a Police Department cruiser. On route the defendant was not questioned concerning the crime, but a general, social, rational conversation took place. At one time the group stopped at a restaurant, where the defendant and the officers together had something to eat. The party arrived in Washington late that night. The defendant was placed in the cellblock at Police Headquarters until morning, when he was questioned by members of the homicide squad. He again gave a full, frank, and rational statement freely, which was recorded on a typewriter and which he signed. There were no substantial discrepancies between the statement given to the county prosecutor in New Jersey, and that made to the Metropolitan Police Department. All of the officers involved from each of the two departments testified that throughout the defendant's actions and conversation were entirely rational.

The defendant's brother testified that during the two hours' visit that they had on the evening of February 4, at the brother's home, the defendant's conversation was wholly rational. There was but scant lay testimony tending to support the defendant's contention on this issue. His sister testified that from time to time he had stated that he had pains in his stomach as though there were snakes in it. The conclusion is inescapable that on the sum total of the evidence the issue of mental competency

involved a question of fact for the jury and had to be submitted to it for its decision.

■ Obviously the opinions of psychiatrists constitute evidence to be considered and weighed by the jury, together with other evidence, but are not binding on it. Otherwise, a trial by experts would be substituted for a trial by jury. That the testimony of psychiatrists does not preclude the jury from reaching a contrary verdict on other evidence in the case, was ably and emphatically demonstrated by Judge Arnold in Holloway v. United States, 80 U.S.App.D.C. 3, 5, 148 F.2d 665, 667, where he made the following statement:

"A complete reconciliation between the medical tests of insanity and the moral tests of criminal responsibility is impossible. The purposes are different; the assumptions behind the two standards are different. For that reason the principal function of a psychiatrist who testifies on the mental state of an abnormal offender is to inform the jury of the character of his mental disease. The psychiatrist's moral judgment reached on the basis of his observations is relevant. But it cannot bind the jury except within broad limits."

Judge Arnold also indicated that great weight must be attached to evidence indicating that a defendant talked rationally at the time of the commission of the offense or shortly thereafter. On this point, Judge Arnold made the following significant remarks:

"To command respect criminal law must not offend against the common belief that men who talk rationally are in most cases morally responsible for what they do."

Here the three psychiatrists were agreed that in April and May, 1954, two and three months after the crime was committed, the defendant was insane. Only two of the three felt able to express the opinion that the defendant had been insane at the time of the commis-

sion of the offense. As there was no former history of insanity, it is entirely possible that he became insane subsequently to his arrest, as a result of brooding over what he had done. Apparently the jury thought so. On the other hand, the jury had a right to believe that a person who could drive an automobile all the way from New Jersey to Washington, after dark, without deviating from the route, have a two-hour rational, social conversation with his brother, plan to arrive at his uncle's home at the time he knew the uncle would return from work, explain at the trial that during a scuffle with the uncle the gun went off accidentally, and after the shooting take the regular route back to his home in New Jersey and continue on it until arrested several hours later, give perfectly rational answers to two police interrogations, carry on a rational conversation with police officers while being taken back from New Jersey to Washington, was of sound mind during the crucial time. In any event the evidence required the submission of the issue to the jury, and its decision should not be disturbed.

■ The experience of trial judges trying cases with juries from day to day, leads to the view that strong reliance should be placed on the common sense and the feeling for substantial justice possessed and applied by the average jury. Juries generally have a keen discernment and exercise a sound judgment.

■ This court, therefore, adheres to the view that the issue of mental competency was properly submitted to the jury and that the verdict is sustained by the evidence.

■ This leaves for discussion the procedural problem here involved. The consideration of this aspect of the case must start with the major premise that a motion for judgment notwithstanding the verdict may be granted only if a motion for a judgment of acquittal should have been allowed at the conclusion of the presentation of evidence at the trial.

A motion for a judgment notwithstanding the verdict is but a renewal of the former motion, and its scope is no greater than that of a motion for judgment of acquittal.[9]

 The ultimate question, therefore, is whether the court has power to direct a verdict of not guilty on the ground of insanity. Under the statutes of the District of Columbia such a verdict would lead to a mandatory commitment of the defendant to a mental institution where he might be confined for an indefinite period without further legal proceedings of any kind. This situation leads to the query whether the defendant would not be deprived of his full right to a jury trial by the direction of a verdict that would necessarily result in his incarceration instead of in his freedom. An inherent feature of the common law trial by jury accorded by the Constitution of the United States to all defendants in criminal cases in Federal courts comprizes the power of the jury to find the defendant not guilty, even if the evidence of guilt is overwhelming or conclusive. A defendant may not be deprived of this right. No doubt this constitutional privilege, as all others, can be waived. This court, however, has grave doubt whether counsel may waive it by implication merely by making a motion. The waiver, if made at all, must be made knowingly and intelligently by the defendant himself, as is the case with a waiver of indictment, waiver of a jury trial, or waiver of the right of counsel. No attempt to adduce such a waiver was made in this case. The court is, therefore, of the opinion that it lacks power to direct the entry of judgment of acquittal on the ground of insanity in this case.

The court concludes that it lacks the authority to grant the motion, but that even if such right existed, the motion should be denied on the merits. Accordingly the motion for judgment notwithstanding the verdict is denied.

9. Federal Rules of Criminal Procedure, Rule 29(b), 18 U.S.C.A. Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 250, 61 S.Ct. 189, 85 L.Ed. 147; United States v. Robinson, D.C., 71 F.Supp. 9, 10; Orfield, Criminal Procedure from Arrest to Appeal, 438.