**UNITED STATES of America,**
**Plaintiff,**

v.

**Marmion POLLARD, Defendant.**
**No. 36912.**

United States District Court
E. D. Michigan, S. D.
March 16, 1959.

Fred W. Kaess, U. S. Atty., George E. Woods, Chief Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Kermit G. Bailer, Detroit, Mich., for defendant.

LEVIN, District Judge.

The defendant, Marmion Pollard, having waived indictment, the Government instituted this prosecution on a three-count information charging him, under Section 2113(d), Title 18 U.S.C., with the attempted robbery of the Chene-Medbury Branch of the Bank of the Commonwealth and the 24th-Michigan Branch of the Detroit Bank & Trust Company on May 21, 1958, and the attempted robbery on June 3, 1958, of the Woodrow Wilson-Davison Branch of the Bank of the Commonwealth. These banks, members of the Federal Reserve System and insured by the Federal Deposit Insurance Corporation, are located in Detroit, Michigan.

On arraignment, the accused pleaded guilty before another judge of this Court. Subsequently, upon advice of counsel, he moved to set aside the guilty plea on the ground that he was insane at the time he committed the acts upon

which the prosecution was based. The Court, with the acquiescence of the Government, permitted the defendant to withdraw his guilty plea, and a plea of not guilty was entered. The case was then assigned to me for trial.

Prior to trial, I was advised that a psychiatric report of a psychiatrist retained by the defendant indicated that the defendant was, at the time of the offenses, suffering from a diseased mind which produced an irresistible impulse to commit the criminal acts. Subsequently, a report was submitted to the Government by each of two psychiatrists who had examined the defendant at its request. These reports, which were made available to me, agreed with the conclusion of the defendant's psychiatrist. It then appeared to me that it would be in the interest of justice to secure a psychiatric evaluation of defendant's state of mind based upon more extensive study. I was particularly desirous of having such a study made inasmuch as the psychiatric reports submitted to me were based on interviews that did not exceed a maximum of two hours with each of the three psychiatrists. I, thereupon, on October 10, 1958, entered an order that the defendant be sent to the United States Medical Center at Springfield, Missouri. After a study of thirty days, the Medical Center submitted a report which was introduced in evidence. The gist of the report may be set out as follows:

During the period under inquiry, "a dissociative state may have existed and that his [defendant's] actions may not have been consciously motivated.

"It is, therefore, our opinion that during the period in question, Pollard, while intellectually capable of knowing right from wrong, may have been governed by unconscious drives which made it impossible for him to adhere to the right.

" * * * We readily acknowledge our inability either to marshal sufficient objective facts or formulate a completely satisfactory theory on which to base a solid opinion as to subject's responsibility during the period in question."[1]

The defendant elected to be tried by the Court without a jury. During the trial, the following facts appeared:

The defendant is an intelligent, twenty-nine year old man. In 1949, he married and, during the next four years, three sons and a daughter were born of this marriage. He was apparently a well-adjusted, happy, family man. In 1952, he became a member of the Police Department of the City of Detroit and continued to work as a policeman until he was apprehended for the acts for which he is now being prosecuted. In April, 1956, his wife and infant daughter were brutally killed in an unprovoked attack by a drunken neighbor.

On May 21, 1958, one day before he remarried, at about 11:00 A.M., defendant entered the 24th-Michigan Branch of the Detroit Bank & Trust Company. He paused for a few moments to look over the bank and then proceeded to an enclosure in which a bank official was at work. He told the official, whom he believed to be the manager, that he wanted to open a savings account. He then walked through a swinging gate into the enclosure, sat down at the desk, pulled out a gun and pointed it at the official. He ordered the official to call a teller. When the teller arrived, the defendant handed a brown paper grocery bag to him and told him to fill it with money.

1. Not only is this report, in the light most favorable to the defendant, inconclusive but in part is based upon facts which were not substantiated during the trial. The personal and social history section of the report states that after his wife's death "it was noted by his supervisors that he [defendant] became less efficient, less interested, more withdrawn and a noticeably less effective policeman". However, the police department records introduced in evidence reveal that the defendant's police work covering the period of inquiry, if anything, was more effective than his service prior to the death of his wife.

While it was being filled, defendant kept the bank official covered. The teller filled the bag with money as ordered and turned it over to the defendant. Thereupon, defendant ordered the bank official to accompany him to the exit. As both the defendant and bank official approached the exit, the official suddenly wrapped his arms around the defendant, who then dropped the bag and fled from the bank and escaped.

About 4:00 P.M., on the same day, he entered the Chene-Medbury Branch of the Bank of the Commonwealth and walked to a railing behind which a bank employee was sitting. He pointed his gun at the man and hold him to sit quietly. The employee, however, did not obey this order but instead raised an alarm, whereupon the defendant ran from the bank and again escaped.

After the defendant was apprehended by the Detroit Police under circumstances which I shall later relate, he admitted to agents of the Federal Bureau of Investigation that after his abortive attempts to rob the two banks, he decided to rob a third bank and actually proceeded on the same day to an unnamed bank he had selected but decided not to make the attempt when he discovered that the bank was "too wide open"—had too much window area so that the possibility of apprehension was enhanced.

On June 3, at about 3:00 P.M., the defendant entered the Woodrow Wilson-Davison Branch of the Bank of the Commonwealth and went directly to an enclosure behind which a male and female employee were sitting at desks facing each other. Defendant held his gun under a jacket which he carried over his right arm. He ordered the woman employee to come out from behind the railing. In doing so, she grasped the edge of her desk. Defendant, in the belief that she may have pushed an alarm button, decided to leave but ordered the woman to accompany him out of the bank. When they reached the street, he told her to walk ahead of him, but not to attract attention. Defendant noticed a police car approaching the bank and

waited until it passed him, then ran across an empty lot to his car and again escaped.

On June 11, 1958, he attempted to hold up a grocery market. He was thwarted in the attempt when the proprietor screamed and, becoming frightened, the defendant fled. In so doing, he abandoned his automobile in back of the market where he had parked it during the holdup attempt. Routinely, this car was placed under surveillance and later when the defendant, dressed in his Detroit Police Officer's uniform, attempted to get in it, he was arrested by detectives of the Detroit Police Force.

After his apprehension, the defendant confessed to eleven other robberies, or attempted robberies.

The three psychiatrists who submitted the written reports, all qualified and respected members of their profession, testified that in their opinion the defendant, at the time he committed the criminal acts, knew the difference between right and wrong and knew that the acts he committed were wrong but was suffering from a "traumatic neurosis" or "dissociative reaction", characterized by moods of depression and severe feelings of guilt, induced by the traumatic effect of the death of his wife and child and his belief that he was responsible for their deaths because by his absence from home he left them exposed to the actions of the crazed, drunken neighbor. They further stated that he had an unconscious desire to be punished by society to expiate these guilt feelings and that the governing power of his mind was so destroyed or impaired that he was unable to resist the commission of the criminal acts. In their opinion, however, the defendant was not then, nor is he now, psychotic or committable to a mental institution.

Three of defendant's fellow police officers, called as defense witnesses, testified that during the period in which the defendant committed the criminal acts he had a tendency to be late for work; that at times he was despondent; and that he occasionally seemed to be lost

in thought and did not promptly respond to questions directed to him. One of the officers testified that on one occasion, he repeatedly beat the steering wheel of the police car in which they were riding, while at the same time reiterating the name of his murdered wife. However, none of them found his conduct or moods to be of such consequence that they believed it necessary to report the defendant to a superior officer.

Defendant's present wife, who impressed me as an intelligent person, testified that on two occasions defendant suddenly, and for no reason apparent to her, lapsed into crying spells and that he talked to her once or twice about committing suicide. She also testified that during one such period of depression he pointed a gun at himself; that she became frightened and called the police; that the police came, relieved him of his gun, and took him to the precinct police station; and that after his release he appeared jovial and acted as if nothing had happened. Defendant's brother-in-law stated that the defendant had always been a very happy person but that he became noticeably despondent after the death of his wife and child and expressed a desire to commit suicide because he now no longer had a reason for living.

A police lieutenant of the Detroit Police Department testified that the defendant's police work, during the period with which we are now concerned, as evidenced by his efficiency rating and his written duty reports, was, if anything, more effective than his service prior to the death of his wife.

Counsel for defendant contends that since all the medical testimony was to the effect that the defendant was suffering from an irresistible impulse at the time of the commission of the offenses, this Court must accept this uncontroverted expert testimony and find him not guilty by reason of insanity.

The Federal Courts have recognized "irresistible impulse",[2] in addition to the classic M'Naghten[3] "right and wrong" test, as defenses to criminal conduct. As early as 1897, the Supreme Court, in Davis v. United States, 165 U.S. 373, 378, 17 S.Ct. 360, 362, 41 L.Ed. 750, approved the following charge on insanity:

> " ' *   *   *   "insanity" *   *   * means such a perverted and deranged condition of the mental and moral faculties as to render a person incapable of distinguishing between right and wrong, or unconscious at the time of the nature of the act he is committing, or where, though conscious of it and able to distinguish between right and wrong and know that the act is wrong, yet his will, by which I mean the governing power of his mind, has been otherwise than voluntarily so completely destroyed that his actions are not subject to it, but are beyond his control.' "

██ I have great respect for the profession of psychiatry. Vast areas of information have been made available through its efforts. I have found much comfort in having the assistance of psychiatrists in the disposition of many cases on sentence. Yet, there are com-

2. Keedy, "Irresistible Impulse as a Defense in the Criminal Law", 100 Univ. of Penn.Law Review 956. Some writers doubt whether "irresistible impulse" should be recognized as a defense to criminal conduct. Dr. Frederic Wertham, "The Show of Violence"; Waelder "Psychiatry and the Problem of Criminal Responsibility", 101 Univ. of Penn.Law Review 378; Hall, "Psychiatry and Criminal Responsibility", 65 Yale Law Journal 761; Moreland, "Mental Responsibility and the Criminal Law—A Defense", 45 Kentucky Law Journal 215.

3. The M'Naghten rule stems from the statement by the House of Lords in 1843 that " *   *   * the jurors ought to be told *   *   * that to establish a defense on the ground of insanity, it must be clearly proved that at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." M'Naghten case, 10 Cl. & Fin. 200, 210; 8 Eng.Rep. 718, 722.

478

pelling reasons for not blindly following the opinions of experts on controlling issues of fact. Expert testimony performs a valuable function in explaining complex and specialized data to the untutored lay mind. When the experts have made available their knowledge to aid the jury or the Court in reaching a conclusion, their function is completed. The opinions and judgments or inferences of experts, even when unanimous and uncontroverted, are not necessarily conclusive on the trier of the facts and may be disregarded when, in the light of the facts adduced, such judgments, opinions or inferences do not appear valid. The jury, in determining the probative effect to be given to expert testimony, is not to disregard its own experience and knowledge and its collective conscience. See Taylor v. United States, 95 U.S.App. D.C. 373, 222 F.2d 398; McIntosh v. United States, 8 Cir., 176 F.2d 514; Holloway v. United States, 80 U.S.App. D.C. 3, 148 F.2d 665; People v. Darling, 107 Cal.App.2d 635, 237 P.2d 691; State v. Moore, 42 N.M. 135, 76 P.2d 19; Commonwealth v. Patskin, 375 Pa. 368, 100 A.2d 472. It follows that this is also true of the judge sitting without a jury.

■ Both the M'Naghten and the "irresistible impulse" tests have been the subject of persistent criticism [4]—the M'Naghten test, on the ground that it emphasizes the intellectual or cognitive element and consequently de-emphasizes the volitional and emotional facets of personality; the "irresistible impulse" test on the ground that it gives no recognition to mental illness characterized by brooding and reflection, and so relegates acts caused by such illness to the application of the inadequate right-wrong test; and that both of these tests are premised on a compartmentalized approach to personality and thus ignore the fact that man functions as an integrated, unitary being. In 1954, in the celebrated Durham v. United States case, 214 F.2d 862, 875, Judge Bazelon, with the concurrence of Judge Edgerton and Judge Washington, excited the psychiatric and legal professions by enlarging the area of inquiry where the defense of insanity is raised, by posing as the crucial questions (1) whether the accused was suffering from a mental disease or defect, and (2) whether the criminal act was the product of that condition.[5] This test received mixed reaction. Voss v. United States, 8 Cir., 259 F.2d 699; Sauer v. United States, 9 Cir., 241 F.2d 640; Howard v. United States, 5 Cir., 232 F.2d 274; United States v. Smith, 5 U.S.C.M.A. 314; see, also, Sobeloff, "Sanity and the Criminal Law, From McNaghten to Durham, and Beyond", 41 A.B.A.J. 793; Symposiums on Psychiatry and the Law, in 22 Univ. of Chicago Law Review, 317 et seq.; 45 Kentucky Law Journal 215 et seq.; 4 Kansas Law Review 350 et seq., 5 Catholic Lawyer 3 et seq.; Hall, "Psychiatry and Crim-

4. See the detailed bibliography in Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 870, footnote 25, 45 A.L.R. 2d 1430.

5. In the Durham case, the Court said that the charge to the jury on the question of insanity should in some way convey to the jury the sense and substance of the following: "If you the jury believe beyond a reasonable doubt that the accused was not suffering from a diseased or defective mental condition at the time he committed the criminal act charged, you may find him guilty. If you believe he was suffering from a diseased or defective mental condition when he committed the act, but believe beyond a reasonable doubt that the act was not the

product of such mental abnormality, you may find him guilty. Unless you believe beyond a reasonable doubt either that he was not suffering from a diseased or defective mental condition, or that the act was not the product of such abnormality, you must find the accused not guilty by reason of insanity. Thus your task would not be completed upon finding, if you did find, that the accused suffered from a mental disease or defect. He would still be responsible for his unlawful act if there was no causal connection between such mental abnormality and the act. These questions must be determined by you from the facts which you find to be fairly deducible from the testimony and the evidence in this case".

inal Responsibility", 65 Yale Law Journal 761. Its adherents declare that it is more in harmony with psychiatric thought and that it enables the psychiatrist to testify in his own language and to give evidence that is relevant by a standard known to him. In contrast, its detractors contend that, among other reasons, it does not give any guide to the jury to enable it to reach a determination on the question of the defendant's sanity. However, since neither the Government nor the counsel for the defendant contended that this test should be adopted in this jurisdiction, it is unnecessary for me to evaluate the Durham test. Nor would its use in this case affect the result that I have reached. Even under the Durham rule, the ultimate question of the sanity of the accused is one of fact for the jury. " * * * we permit it [the jury] to perform its traditional function which, as we said in Holloway, is to apply 'our inherited ideas of moral responsibility to individuals prosecuted for crime * * *.' " Durham v. United States, supra, 214 F.2d at page 876. Justice William O. Douglas, in an address given at the Annual Commencement of the William Alanson White Institute, New York City, on January 28, 1956,[6] put it this way: "The psychiatrist merely expounds on the theoretical and clinical aspects of the problem. The jury evaluates his testimony, as it does the evidence on every other factual issue. That is the correct disposition, for the question whether society should assess punishment for criminal conduct is, in the last analysis, a moral judgment. The jury, being of the community, reflects its attitudes and speaks for it".

The wisdom of this approach is readily apparent. The opinions of experts, testifying as to the degree of responsibility of which the accused may be capable in view of possible mental disease, are, after all, nothing more than theories which are adopted to explain and account for a given act or course of conduct. Eminent psychiatrists have recognized that "the best psychiatry is still more of art than of science", Sullivan, "Psychiatry", 12 Encyl. Soc. Sci. 578, 580; that wide gaps in knowledge exist; that the validity of psychiatric theory can not be determined with scientific certainty. There is still comparatively little known about causes, let alone effective remedies, and the experts are not yet agreed on basic definitions. Nor can it be ignored that not only is there disagreement among experts, but that some psychiatric doctrines, once considered authoritative, are now rejected. The mystery of human behavior still remains to be solved. These reflections do not deny the value of expert testimony but leaves it to its proper place in the trial of a case.

Nor can I ignore, in evaluating the psychiatric testimony, the philosophical orientation of the psychiatrist. Psychiatry and law approach the problem of human behavior from different philosophical perspectives. Psychiatry purports to be scientific and takes a deterministic position with regard to behavior. "Its view of human nature is expressed in terms of drives and dispositions which, like mechanical forces, operate in accordance with universal laws of causation." Hall, "Psychiatry and Criminal Responsibility", 65 Yale Law Journal 761, 764. For psychiatry, what we do is determined by what we are, and there is little or no room for moral or ethical judgments. In a sense, all criminal behavior, whether it be the acts of the rapist, the forger, the embezzler, the sender of licentious literature through the mails or tax evasion by a reputable businessman, is evidence of mental disease. But the uncritical adoption of this point of view would completely do away with the concept of criminal responsibility.[7] Dangell, Criminal Law, Sec. 128; White, Insanity and the

---

6. This address was reprinted in 41 Iowa Law Review 485, 489, "The Durham Rule: A Meeting Ground for Lawyers and Psychiatrists".

7. Several writers question the substituting of hospitals for jails on the ground that such substitution would not be desirable either for society or the defend-

Criminal Law, at page 26; Weihofen, "Crime, Law and Psychiatry", 4 Kansas Law Review 377, 386. Criminal law is, however, "a practical, rational, normative science which, although it draws upon theoretical science, also is concerned to pass judgment on human conduct. Its view of human nature asserts the reality of free choice and rejects the thesis that the conduct of normal adults is a mere expression of imperious psychological necessity. Given the additional purpose to evaluate conduct, some degree of autonomy is a necessary postulate." Hall, "Psychiatry and Criminal Responsibility", 65 Yale Law Journal, supra at page 764.[8] The recognition of the difference in approach of psychiatry and law is also found in Holloway v. United States, 148 F.2d 665, 667. In that case, Judge Thurman W. Arnold wrote:

"The modern science of psychology is concerned with diagnosis and therapeutics and not with moral judgments. It proceeds on an entirely different set of assumptions. It does not conceive that there is a separate little man in the top of one's head called reason whose function it is to guide another unruly little man called instinct, emotion, or impulse in the way he should go. The tendency of psychiatry is to regard what ordinary men call reasoning as a rationalization of behavior rather than the real cause of behavior. From this point of view, psychiatrists probe behind what ordinary men call the 'reasoning' of an abnormal personality. This tends to restrict the area of moral judgment to an extent that offends our traditional idea that an offender who can talk and think in rational terms is morally responsible for what he does.

ant. DeGrazia, "The Distinction of Being Mad", 22 Chicago Law Review 339; Szasz, "Psychiatry, Ethics and the Criminal Law", 58 Columbia Law Review 183.

" * * * to the psychiatrist mental cases are a series of imperceptible gradations from the mild psychopath to the extreme psychotic, whereas criminal law allows for no gradations. It requires a final decisive moral judgment of the culpability of the accused. For the purposes of conviction there is no twilight zone between abnormality and insanity. An offender is wholly sane or wholly insane.

"A complete reconciliation between the medical tests of insanity and the moral tests of criminal responsibility is impossible. The purposes are different; the assumptions behind the two standards are different."

The psychiatrists, as I hereinbefore related, testified that the defendant suffered from severe feelings of depression and guilt; and that in their opinion he had an irresistible impulse to commit criminal acts, an unconscious desire to be apprehended and punished; and that he geared his behavior to the accomplishment of this end. However, his entire pattern of conduct during the period of his criminal activities militates against this conclusion. His conscious desire not to be apprehended and punished was demonstrably greater than his unconscious desire to the contrary. After his apprehension, despite searching interrogation for over five hours by Detroit Police Officers and by agents of the Federal Bureau of Investigation, he denied any participation in criminal conduct of any kind. It was only after he was positively identified by bank personnel that he finally admitted that he did attempt to perpetrate the bank robberies. I asked one of the psychiatrists to explain this apparent inconsistency. In answer to my question, he stated that although the defendant had an unconscious desire to be apprehended and pun-

8. The views expressed in these articles were originally presented in a paper given at a conference on criminal responsibility by the Menninger Foundation and the University of Kansas on December 2, 1955.

ished, when the possibility of apprehension became direct and immediate, the more dominating desire for self-preservation asserted itself. This explanation may have merit if applied to individual acts. However, the validity of a theory that attempts to explain the behavior of a person must be determined in light of that person's entire behavioral pattern and not with reference to isolated acts which are extracted from that pattern. The defendant's pattern of behavior of May 21, 1958, discloses that the desire for self-preservation was not fleeting and momentary but continuing, consistent and dominant. What, then, becomes of the theory of irresistible impulse? Looking to the events of that day, I am asked to believe, first, that the defendant, acting pursuant to an irresistible impulse, selected a bank site to rob, entered the bank to accomplish that end, purposely failed in the attempt and when the end he sought, apprehension, was in view, escaped because of the dominance, at the moment of ultimate accomplishment, of the stronger drive for self-preservation. I must then believe that when the defendant knew he was apparently free from detection, his compulsive state reasserted itself and that he again went through the steps of planning, abortive attempt and escape. And if I acquiesce in this theory, what other psychiatric theory explains his subsequent conduct—his plan to rob a third unnamed bank and the rejection of that plan because of his subjective belief that the possibility of apprehension would be too great? If the theory remains the same, then it appears that in the latter case, the fear of apprehension and punishment tipped "the scales enough to make resistible an impulse otherwise irresistible." Guttmacher and Weihofen, Psychiatry and the Law, 413. It is a logical inference that, in reality, the other robbery attempts were made as the result of impulses that the defendant did not choose voluntarily to resist because, to him, the possibility of success outweighed the likelihood of detection which is in essence a motivation for all criminal conduct. The impulse being resistible, the defendant is accountable for his criminal conduct.

Psychiatrists admit that the line between irresistible impulse and acts which are the result of impulses not resisted is not easy to trace. Guttmacher and Weihofen, Psychiatry and the Law. To the extent that the line may be traced, the distinguishing motivation of the action, whether the act is performed to satisfy an intrinsic need or is the result of extrinsic provocation, is a determining factor. Admittedly, motivations may be mixed. However, all the facts have clearly established that defendant's criminal activity was planned to satisfy an extrinsic need by a reasoned but antisocial method. The defendant had financial problems of varying degrees of intensity throughout his life. He had financial difficulties during his first marriage. He was now embarking upon a second marriage. He was about to undertake the responsibility of supporting not only a wife and himself, but also four children, three of them the product of his first marriage. In statements given to agents of the Federal Bureau of Investigation admitting his criminal activity, he stated: "Inasmuch as I was about to marry my second wife, I decided that I would not lead the same type of financially insecure life that I led with my first wife. I needed about $5,000 in order to buy a house. My only purpose in deciding to rob a bank was to obtain $5,000 and if I obtained the money, I did not intend to continue robbing." Defendant's entire pattern of conduct was consistent with this expressed motivation.

Life does not always proceed on an even keel. Periods of depression, feelings of guilt and inadequacy are experienced by many of us. Defendant was a devoted husband and loving father. His feelings of despondency and depression induced by the brutal killing of his wife and infant daughter were not unnatural. How else the defendant should have reacted to his tragic loss I am not told. His conduct throughout this

**482**

crucial period did not cause any concern among his colleagues. All stated unequivocally that in their opinion he was sane. Significant also is the fact that his present wife married him on May 22, 1958, after a year of courtship. It is a permissible inference that defendant's conduct relative to his mental condition, as related by her, did not suggest to her that the defendant was insane.

I am satisfied beyond a reasonable doubt that the defendant committed the acts for which he is now charged and that when he committed them he was legally sane.

I, therefore, adjudge the defendant guilty of the three counts of the information.