**Bernard William VOSS, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 15973.**

United States Court of Appeals
Eighth Circuit.

Oct. 17, 1958.

Rodger J. Walsh, Kansas City, Mo., for appellant.

O. J. Taylor, Asst. U. S. Atty., Kansas City, Mo. (Edward L. Scheufler, U. S. Atty., Kansas City, Mo., on the brief), for appellee.

Before SANBORN, JOHNSEN and VAN OOSTERHOUT, Circuit Judges.

SANBORN, Circuit Judge.

This is an appeal in forma pauperis from a judgment and sentence based upon the verdict of a jury finding the defendant (appellant) guilty under an indictment returned September 11, 1957, charging him with having, on or about May 7, 1957, unlawfully transported a stolen motor vehicle from Troy, Kansas, to Liberty, Missouri, knowing it to have been stolen; this in violation of 18 U.S.C. § 2312.

The defendant entered a plea of not guilty, and, through his court-appointed counsel, asked that he be examined as to his mental competency to stand trial. The District Court, on October 7, 1957, ordered him committed to the United States Medical Center for Federal Prisoners at Springfield, Missouri, for examination. Following a thorough psychiatric examination of the defendant, the Psychiatric Staff of that institution reported that, while he was seriously and chronically psychotic, he was competent to stand trial because he was able to appreciate the nature of the proceedings pending against him and was able to properly assist his counsel. The defense asserted at the trial was insanity at the time that the offense charged was committed.

Briefly stated, the facts out of which this case arose are as follows: The defendant, Voss, and Loftus James Quest, in the evening of May 6, 1957, escaped from the United States Disciplinary Barracks at Fort Leavenworth, Kansas,

where each was a prisoner serving a sentence for a military offense. They appropriated a truck on the military reservation, which they drove to Troy, Kansas, where they abandoned it and stole a Ford automobile, which they drove to a point near Liberty, Missouri, where they were arrested in the stolen car on May 8, 1957, by troopers of the Missouri State Highway Patrol. Quest was prosecuted for the offense, entered a plea of guilty, was sentenced, and, at the time of the trial of Voss, was back at the Disciplinary Barracks. He testified as a witness for the Government and described what he and Voss did from the time they stole the truck from the Disciplinary Barracks in Kansas to the time they were arrested in the stolen Ford car near Liberty, Missouri. The ownership of the stolen car, its theft by Quest and Voss in Troy, Kansas, and its transportation by them in interstate commerce from Kansas into Missouri, were established at the trial by uncontroverted evidence. While Voss testified that he had no recollection of participating in the theft of the car, he made no claim that it was not stolen.

Counsel for the defendant, who, properly, has left no stone unturned in his effort to secure defendant's acquittal and has competently represented him in this Court, raises several questions as to the propriety of the trial court's rulings on evidence and on motions to require the production of documents. We have examined the rulings in the light of the record, and are satisfied that none of them, if erroneous, arises to the dignity of reversible error. See and compare, Apt v. United States, 8 Cir., 13 F.2d 126; Miller v. United States, 8 Cir., 21 F.2d 32, 37–38 and cases cited; Affronti v. United States, 8 Cir., 145 F.2d 3, 9–10; Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314; Palmer v. Hoffman, 318 U.S. 109, 116, 63 S.Ct. 477, 87 L.Ed. 645; Kotteakos v. United States, 328 U.S. 750, 764–766, 66 S.Ct. 1239, 90 L.Ed. 1557; Brown v. Allen, 344 U.S. 443, 460, 73 S.Ct. 397, 97 L.Ed. 469.

The only substantial question in the case is whether the District Court misdirected the jury on the issue of insanity. There was evidence in the case which made that issue one for the jury.

Dr. Donald B. Rinsley, Staff Psychiatrist at the Medical Center, who made a thorough study and psychiatric examination of the defendant, was called as a witness for the defendant. The Doctor's detailed report of his examination was introduced in evidence. From it we quote the following:

"The Psychological Tests administered by Mr. Geil underscore the presence of severe disorganizing mental illness that has been present for some time and continues at present. There is some degree of insight in that the patient knows he is disturbed and states that he will doubtless plead Not Guilty by Reason of Insanity if his case comes to trial.

"VI. Summary: This 28 year-old, unmarried white male presents an early history of significant psychiatric difficulties, but we may speculate that the onset of his current, more florid psychotic illness dates from his service period. An early user of alcohol, he developed pathological aggressiveness while intoxicated, somatic symptoms, grossly antisocial acting out while in service, fixed, persecutory ideas that persist currently, gross emotional instability, terrifying dreams, hysteriform symptoms, anxiety and hostility. What is most significant about his underlying personality is the almost boundless degree of hostility and latent destructiveness he harbors. He admits to his ability to commit murder if stimulated to it, and does not know why he has not already killed someone. There is a morbid fascination with killing, murder, mutilation, and violence.

"VII. Diagnosis: 000-x26. Schizophrenic Reaction, chronic undifferentiated type, characterized by flattened, inappropriate affect, fixed persecutory ideas, preoccupation with violence, murder and mutilation, marked autism, psychosexual imma-

turity, marked latent, episodically overt aggressiveness, assaultiveness, and destructiveness, gross antisociality, impaired judgment, hyperalertness, impaired ability to concentrate, variable attentive span, somatic and hysteriform symptoms.

"VIII. Statement of Mental Competency: There can be little doubt that this patient is seriously and chronically psychotic, that he suffers from schizophrenic illness, and that he has suffered from it for a long time. Despite the presence of major mental disorder, however, he does understand the nature of the proceedings against him, and is able to cooperate with counsel, hence, he must be considered mentally competent to stand trial. The examiner must add that this patient is potentially dangerous to himself as well as to others, and when frustrated or appropriately stimulated, especially while under the influence of intoxicants, may be expected to become violent. After due disposition of the charges against him, he should be confined in a suitable mental hospital for indefinite hospitalization and treatment."

Doctor Rindsley testified that, apparently, after the defendant had been inducted into the military service at age twenty-three, his previously existing mental illness became more acute "when subject to certain kinds of regulations and stresses and strains that are commonly found in service life and to which an individual must adapt himself." The Doctor also testified that the mental illness was not constant, not present in the same degree at all times, and that he could not say what the severity of the illness was in May, 1957, when the offense charged in the indictment occurred, and that if the defendant should say that at that time he was at the peak of an incident of his mental illness, he (the Doctor) would have no basis for disbelieving him. When asked whether, at the time of the offense, the defendant knew the difference between right and wrong, the Doctor testified:

"I could not make a definite statement of that because in order to I should have to be present there very, very shortly after the commission of the alleged act in order to give you a valid opinion on this, a valid conclusion based upon the facts of examination. Since I was not there and could not make such an examination, I cannot make such a statement."

The Doctor was then asked whether, if the defendant was, at the time of the offense, in the mental condition described, he could have known the difference between right and wrong; and gave the following answers:

"The answer to that question I would feel would be, I think it is possible that he might know right from wrong at that time; it is equally probable, however, that he might not. The reason for either of these would be dependent upon his state of mind at the time. As I mentioned before, this state of mind gets better and worse, comes and goes. In a state of very bad mental functioning at that time, it is entirely possible that he did not know; in a state of relatively good functioning, which was possible for him, then it is possible that he would know, he would know right from wrong."

On cross-examination, the Doctor testified that the examination given the defendant at the Medical Center indicated that he was aware of the charge against him; that he would be brought to court before a judge for trial; that he was accused of having participated in the transportation of a motor vehicle from one state to another, knowing it was stolen; and that the law prohibited such acts.

The Doctor was then asked this question by the court:

"Was there any time during that period of examination when you would say that he was unaware of

the difference between right and wrong?"

The Doctor's answer was:

"At the time I examined him and during our period of observation, Your Honor, he showed evidence that he was aware of the difference between right and wrong in the commonly accepted sense of the term."

There was much more of the Doctor's testimony, but the sum and substance of it was that the defendant, for a long time, had had a serious mental illness which might or might not have prevented him from knowing what he was doing when, in May of 1957, he participated in the theft of the automobile in Troy, Kansas, and in its transportation into Missouri, and from knowing that what he did was wrong.

The defendant testified in his own behalf. He detailed his troubles with the law and with the Army, terminating in his confinement in the Disciplinary Barracks at Fort Leavenworth. His testimony was, in substance, that two or three days before leaving the Disciplinary Barracks he had a headache such as he had frequently had since he was seven or eight years old, but which had become worse the last four or five years; that he felt dazed or dizzy; that he met Quest at the Disciplinary Barracks; that he had heard Quest's testimony in court; that he had no recollection of driving the stolen car, or of stealing the car, or of leaving the Disciplinary Barracks, or of anything that happened in Kansas; that he did remember riding in the car after it was in Missouri, and being arrested near Liberty, Missouri.

At the close of the evidence, the defendant moved for a directed verdict of acquittal. The motion was properly denied.

The defendant requested the court to give the following instruction relative to the issue of insanity:

"If you the jury believe beyond a reasonable doubt that the accused was not suffering from a diseased or defective mental condition at the time he committed the criminal act charged, you may find him guilty. If you believe he was suffering from a diseased or defective mental condition when he committed the act, but believe beyond a reasonable doubt that the act was not the product of such mental abnormality, you may find him guilty. Unless you believe beyond a reasonable doubt either that he was not suffering from a diseased or defective mental condition, or that the act was not the product of such abnormality, you must find the accused not guilty by reason of insanity. Thus your task would not be completed upon finding, if you did find, that the accused suffered from a mental disease or defect. He would still be responsible for his unlawful act if there was no causal connection between such mental abnormality and the act. These questions must be determined by you from the facts which you find to be fairly deducible from the testimony and the evidence in this case."

The court instructed the jury that "the term 'insanity', as used in this defense means such a perverted and deranged condition of the mental and moral faculties as to render a person incapable of distinguishing between right and wrong, or unconscious at the time of the nature of the act he is committing."

The court also charged the jury that, since evidence of insanity had been introduced, the burden of establishing beyond a reasonable doubt the sanity of the defendant was on the Government.

The instruction of the District Court as to the test to be applied by the jury in determining whether the defendant was to be held legally responsible for the offense charged was in accord with the rulings of the Supreme Court of the United States, which has thus far approved the test of the M'Naghten case, 10 Cl. & Fin. 200. See Davis v. United States, 160 U.S. 469, 476–477, 480–493, 16 S.Ct. 353, 40 L.Ed. 499; Davis v. United States, 165 U.S. 373, 378, 17 S.Ct.

360, 41 L.Ed. 750. Fisher v. United States, 328 U.S. 463, 467–468, 66 S.Ct. 1318, 90 L.Ed. 1382; in which a charge substantially similar to that complained of here was approved. In Leland v. Oregon, 343 U.S. 790, 793–796, at page 800, 72 S.Ct. 1002, at page 1008, 96 L.Ed. 1302, the Supreme Court said:

" * * * Knowledge of right and wrong is the exclusive test of criminal responsibility in a majority of American jurisdictions. The science of psychiatry has made tremendous strides since that test was laid down in M'Naghten's Case [10 Cl. & Fin. 200], but the progress of science has not reached a point where its learning would compel us to require the states to eliminate the right and wrong test for their criminal law. Moreover, choice of a test of legal sanity involves not only scientific knowledge but questions of basic policy as to the extent to which that knowledge should determine criminal responsibility. This whole problem has evoked wide disagreement among those who have studied it. In these circumstances it is clear that adoption of the irresistible impulse test is not 'implicit in the concept of ordered liberty'."

There is no contention that the irresistible impulse test should have been included in the court's instructions in the instant case, or that that could have been appropriate in view of the evidence.

The defendant contends that the trial court should be reversed for refusing to give his requested instruction which was based on the so-called "Durham Rule" announced by the United States Court of Appeals for the District of Columbia in the case of Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 874, 45 A.L.R.2d 1430. "It is simply that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect."

The Ninth Circuit has refused to adopt the Durham Rule. Andersen v. United States, 9 Cir., 237 F.2d 118, 126–128; Sauer v. United States, 9 Cir., 241 F.2d 640, certiorari denied 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed.2d 1539. The Fifth Circuit has also declined to follow that Rule. Howard v. United States, 5 Cir., 232 F.2d 274, 275.

We think it can be no concern of this Court whether the M'Naghten Rule is, from a psychological, medical, or scientific standpoint, accurate or not. The Rule has thus far, with few exceptions, constituted the test for determining legal responsibility of those accused of crime. Certainly, a federal trial judge who follows the teachings of the United States Supreme Court in this regard cannot justifiably be held to have committed an error of law.

It is of some interest to note that the District Court, in sentencing the defendant to two years' imprisonment, recommended that he be committed to the United States Medical Center at Springfield, Missouri, where he can receive proper care for his mental illness and at the same time be restrained from further violations of the law.

The judgment appealed from is affirmed.