Milton R. DUSKY, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 16194.

United States Court of Appeals
Eighth Circuit.

Nov. 6, 1959.

James W. Benjamin, Kansas City, Mo., for appellant.

O. J. Taylor, Asst. U. S. Atty., Kansas City, Mo. (Edward L. Scheufler, U. S. Atty., Kansas City, Mo., was with him on the brief), for appellee.

Before SANBORN, WOODROUGH and MATTHES, Circuit Judges.

SANBORN, Circuit Judge.

This is an appeal in forma pauperis from a judgment and sentence of imprisonment based upon the verdict of a jury finding the defendant, Milton R. Dusky,

guilty under an indictment returned September 10, 1958, charging him with having, on or about August 19, 1958, in violation of 18 U.S.C. § 1201, unlawfully transported in interstate commerce from Johnson County, Kansas, to Ruskin Heights, Missouri, a certain girl who had been unlawfully decoyed, kidnapped and carried away.

Broadly stated, the main contentions of the defendant are, in substance, that the court committed reversible error (1) in finding him mentally competent to stand trial; (2) in denying his motion, made at the close of the evidence at the trial, for a directed verdict of acquittal, and in submitting the issue of his sanity to the jury; and (3) in instructing the jury on that issue. It is asserted also that certain happenings and rulings at the trial rendered it unfair and entitle the defendant to a reversal of his conviction.

The defendant was unable to employ counsel, and the District Court on September 11, 1958, appointed as his attorney Mr. James W. Benjamin, of the Kansas City, Missouri, Bar, who, without recompense or hope of reward, has, on his own time and at his own expense, admirably represented the defendant in the trial court and in this Court.

Upon his arraignment on September 12, 1958, the defendant entered a plea of not guilty. At the suggestion of his counsel that there was a question of the defendant's mental competency to stand trial and that there might be a question whether he could be found mentally responsible for the crime charged against him, the court, pursuant to 18 U.S.C. § 4244, ordered the defendant committed to the United States Medical Center for Federal Prisoners at Springfield, Missouri, for examination as to his mental competency to stand trial, and, in addition, "to determine, insofar as possible, whether, on August 19, 1958, the defendant was possessed of sufficient mental and moral faculties as to be capable of distinguishing between right and wrong and to be conscious of the nature of the acts which he was then doing or committing, * * *."

The defendant remained at the Medical Center for examination, observation and treatment for a total period of four months.

At a hearing held pursuant to 18 U.S. C. § 4244, on January 21, 1959, to determine whether the defendant was competent to stand trial, the court had before it a detailed report of a Neuropsychiatric Examination of the defendant. This report was dated October 30, 1958, and was signed by Doctor L. Moreau, Staff Psychiatrist at the Medical Center. On the last page of the report appears the following:

"He is oriented as to time, place, and person. He denies complete memory of the events of the day of the alleged offense.

"He gives the impression clinically of being of approximately average intelligence. His responses to the abstractions tests indicate approximately normal capacity for abstract thinking.

"Psychological testing done at this institution on September 17, 22, and 24, 1958, indicate 'a personality which has decompensated to a psychotic degree of severity and thus implying the personality loss of capacity to master conflict situations and to meet reality demands.' Prominent among the test findings were evidences of fear, inadequacy, anxiety, impulsiveness, poor reality contact, lack of ego strength, auditory and visual hallucinations, depression, nervous tension, morbid preoccupation with hostility, suicide, murder, sexual indulgence succumbing to a state of insanity. It was noted that the patient stated that taking the psychological tests caused him to become nervous and that he wouldn't have been able to go through with the testing procedures had he not been taking Sparine.

"VI. Summary: This patient, charged with kidnapping, has no previous criminal record. In No-

vember, 1949, he was investigated for robbery and was released the same day. He was reared in an atmosphere of severely traumatic circumstances because of the discord between his parents and has always suffered from feelings of inadequacy. He has been grossly maladjusted since childhood. He was discharged from the Navy because of a psychoneurosis and has been a patient in Veterans Administration hospitals on two occasions since 1956. He has also received psychiatric care through the psychiatric receiving center in Kansas City, Missouri. Since admission to the Medical Center he has shown marked emotional turmoil, insomnia, tension, feelings of self-devaluation, ambivalent feelings, and impaired judgment and insight. He complains of having feelings of being followed and visual hallucinations. Almost since admission he has required the use of tranquilizing medications.

"VII. Diagnosis: 000-x26 Schizophrenic reaction, chronic undifferentiated type, as manifested by visual hallucinations, tension, insomnia, emotional turmoil, ambivalence, morbid preoccupations, depression, feelings of inadequacy and unworthiness, and a long history of alcoholism and inadequacy."

Attached to this report was a report of the Psychiatric Staff of the Medical Center, dated October 30, 1958, signed by Doctor Joseph C. Sturgell, Chief of the Neuropsychiatric Service, reading as follows:

"The findings of psychiatric examination were presented by Dr. Louis Moreau. Other records were reviewed and the patient was interviewed by the members of the Psychiatric Staff.

"It is the opinion of the staff, following interview of the patient, that he had improved in recent weeks but his condition is still such that he is unable to understand the nature of the proceedings with reference to the charges against him and is unable to properly assist counsel in his defense. The patient is receiving tranquilizing medications and would probably deteriorate quickly if treatment was stopped at this time.

"It is recommended that he be left at the hospital an additional sixty (60) days so that recent improvement can be tested following discontinuation of tranquilizing drugs. It is probable that he would then be considered competent.

"In view of the long history of chronic anxiety, depressions, alcoholism, insomnia, phobias, and marital discord, it is apparent that this man has had episodes of mental illness with intermittent periods of improvement. His condition at the actual time of the offense is impossible to evaluate accurately since the only information available is that provided by the patient. The staff, therefore, is unable to determine whether or not on August 19, 1958 the defendant was possessed of sufficient mental and moral facilities as to be able to distinguish between right and wrong."

The court also had before it a report of the Neuropsychiatric Staff of the Medical Center, dated January 20, 1959, as to an examination of the defendant on January 8, 1959, signed by Doctor Sturgell for the Psychiatric Staff. It reads as follows:

"This 33-year-old white male was admitted to the hospital 9-14-58 for examination in accordance with Section 4244, Title 18, U.S.C.

"The initial examination of this patient indicated that this man has had episodes of mental illness probably of several years duration with remissions and exacerbations. He appeared to be in one of his periods of relapse at the time of admission with overt symptoms being apparent. However, following several weeks of medication he improved so that at the time of his initial appear-

ance for examination by the NP Staff 10–30–58 it was thought that he was improving and that the maximum improvement had not occurred. For this reason the court was asked to extend his examination for a period of 60 days until maximum improvement had occurred.

"Following the staffing on 10–30–58 the patient's mental condition remained fairly stable for about 6 weeks. Then he began to become agitated, anxious, and hostile to people around him. He expressed discouragement with his situation and began to feel that he was being framed in the present offense. He experienced hallucinations, delusions, and ideas of reference.

"When examined by the staff, the patient again presented evidence of symptoms mentioned above. The staff is of the opinion that this man is mentally ill with a diagnosis of schizophrenia. Because of this illness, he is unable to properly understand the proceedings against him and unable to adequately assist counsel in his defense."

The only witness testifying at the hearing was Doctor Sturgell, whose testimony was in substantial conformity with the reports in evidence. He explained the statement in Doctor Moreau's report that the defendant was oriented as to time, place and person, as follows:

"This means that he is able to know the day of the week, the hour, the place in which he finds himself geographically, and the circumstances of his present situation. He knows he is in a court room; he knows the day of the week and the day of the year, and he knows that you are his attorney and Judge Smith is the judge. This is the orientation to person. He knows it all."

Doctor Sturgell also expressed the opinion that the defendant understood what he was charged with, knew that if there was a trial it would be before a judge and jury, knew that if found guilty he could be punished, and knew who his attorney was and that it was his duty to protect the defendant's rights. It appeared from Doctor Sturgell's testimony also that the defendant had been able to furnish, with substantial accuracy, information as to his past history and as to at least some of the events leading up to the occurrence upon which the indictment was based. The Doctor expressed the opinion that the defendant would be unable properly to assist his attorney in his defense "because I do not think that he can properly interpret the meaning of the things that have happened. I don't think he can convey full knowledge of his actual circumstances * * * due to an inability to interpret reality from unreality, * * * to suspicions of what is going on, * * * to confused thinking, which is part of his mental illness." The Doctor also testified that the defendant "would be able to tell his attorney of the events, as he recalls them, as interpreted by the thinking which is directly connected with his mental illness," which could result in a false factual statement to his attorney.

Doctor Sturgell stated that the defendant, who—the report of Neuropsychiatric Examination dated October 30, 1958, showed—had said he drank two pints of vodka during the night before the acts of August 19, 1958, were committed, and continued to drink heavily the following day, could have been drunk, and so unable to remember the crucial events of that day. There was other testimony by the Doctor in support of his views that the mental illness of the defendant would or could disable him from adequately assisting his counsel in his defense, but enough has been said to indicate the views of the Psychiatric Staff of the Medical Center as to the mental competency of the defendant to stand trial.

The District Judge, at the conclusion of the hearing, decided that the defendant had sufficient mental competency to stand trial, saying:

"That is not in any way saying, gentlemen, that he is responsible, as

not being mentally incompetent, for the offense for which he is being tried. It is simply in the narrow test that is used in the hearing under Section 4244 of Title 18. Since he is oriented as to time and place and person, since he, in my opinion based on the limited evidence that has been presented so far, is able to assist counsel in his own defense, then it will be concluded that he is mentally competent to stand trial and will be retained here until the case is set for trial."

Defendant's counsel then made the following statement:

"[Mr. Benjamin:] Your Honor, may the record show my objection and exception to the Court's ruling in view of the undisputed testimony of the Government's witness, the psychiatrist, the Government psychiatrist, that he [the defendant] is not properly able to assist in his defense and I, as his attorney, have reached that same conclusion, although I do not feel, as his attorney, that I should take the witness stand and be sworn and offer evidence in that regard. I make this statement as a lawyer to the Court and I believe that the man is not properly able to assist his counsel in his defense and should not be tried at this time."

The case was tried, commencing March 2, 1959. Before the selection of the jury, the Court made the following statement to the jury panel:

"Ladies and gentlemen of the panel: This is a criminal case in which the United States is prosecuting, under an indictment returned by the Grand Jury, Milton Richard Dusky, the gentleman in the brown suit seated at the counsel table to my right, under a charge of kidnapping under circumstances in which it is alleged that the defendant, Mr. Dusky, in company with two boys or young men, forcibly transported a young woman across the state line and ravished her under circumstances that it is alleged constituted a violation of the Federal Kidnapping Statute. The incident is alleged to have occurred on August 19, 1958, and it is charged that this young woman was transported in interstate commerce from Johnson County, Kansas, to Ruskin Heights, Missouri. It was further charged that the young lady, one Joan Rae McQuerry, was not liberated unharmed, all in violation of Section 1201 of Title 18 of the United States Code."

No exception was taken to the statement at the time, but, after the selection of the jury, counsel for defendant excepted to it on the ground that it created the impression that the defendant had participated in the ravishment of the girl, which was not what he was charged with in the indictment. Counsel asserted that, under the indictment, any evidence of the forcible taking of the girl from Missouri to Kansas would be inadmissible, and asked that the evidence be confined to her alleged forcible kidnapping and transportation from Kansas to Missouri. The motion was overruled.

The Government's evidence with respect to the events which gave rise to the indictment was uncontradicted. The victim of the kidnapping was a high school girl 15 years of age at the time. She lived with her parents in Ruskin Heights, a suburb of Kansas City, Missouri. On August 19, 1958, about noon, while she was walking to a drug store in Ruskin Heights to have lunch with a friend, the defendant with two boys— Leonard Dischart, 14 years of age, and Richard Nixon, 16 years of age—drove up in the defendant's automobile and gave her a ride to the drug store. She was an acquaintance of Nixon. After leaving her, they went down to the "Wheel-Inn Drive-In," in Ruskin Heights, where they had a discussion about taking the girl out for the purpose of having sexual intercourse with her. They were all drinking vodka. After that, they went back to the drug store, and there, or near there, decoyed

her into the automobile under the pretext of taking her home and also to see some girl she knew. She was driven to a back road in Kansas, where she was forcibly undressed and raped by the two boys, and where the defendant attempted to rape her. After these happenings, the girl was permitted to put her clothing on, and was driven by the defendant, in his car, accompanied by the boys, back to Ruskin Heights, Missouri. The car stopped at the "Wheel-Inn Drive-In," where the girl, who was permitted to get out of the car for a drink of water, ran into the back room of the Drive-In and told a Mr. Delair, whom she knew, that she had been raped. Thereupon the defendant and the two boys drove away.

The defense at the trial was insanity. Under the evidence of the Government, no other defense would seem to have been available to the defendant. He and Dischart were arrested in the evening of August 20, 1958, under a warrant. Upon being advised at that time that the charge was kidnapping, the defendant said: "that is a pretty serious charge, isn't it?" Upon being told it referred to the "girl that you all picked up the other morning out in Ruskin Heights," the defendant said: "That wasn't a kidnapping. She got in the car voluntarily." On the following morning the defendant gave to the agent of the Federal Bureau of Investigation who had participated in his arrest a written statement which conformed substantially with the facts as testified to by the girl and by Richard Nixon (who is serving time for his participation in the offense).

After proving that the girl named in the indictment had, on August 19, 1958, been transported from Kansas to Missouri by the defendant after she had been decoyed, abducted and kidnapped within the meaning of 18 U.S.C. § 1201, the Government rested.

Doctor Joseph C. Sturgell and Doctor John K. Dickinson, of the United States Medical Center, testified for the defendant. Their testimony did not differ substantially from the testimony of Doctor Sturgell given at the hearing on January 21, 1959, relating to the defendant's mental capacity to stand trial, as determined from their study of him while at the Medical Center. Doctor Sturgell testified as to the defendant's unfortunate history from his early childhood. He stated that the examination at the hospital gave a diagnosis of schizophrenia, and that he had no doubt the defendant was suffering from that disease. He said: "This [schizophrenia] is a condition called a psychosis, which is the severest form of mental illness, characterized by disturbances in the ability to think clearly. There is a disorder in thinking; there is a disorder in the area of feeling, the ability to express feeling in terms [omission] certain incidents; it is a disturbance within the individual to where he is unable to feel some of the experiences of joy and sadness which we feel. He may misinterpret them in his thinking and interpret them according to distorted ideas, such as delusions and hallucinations which are not realistic, and his behaviour is abnormal in terms of response to these ideas of thinking and feeling. So that in essence it is a disturbance in thinking, feeling and acting or behaviour." The Doctor said that schizophrenia "is thought of as a long time developing illness and lasts for a long time," and that the defendant's previous mental and nervous disturbances fitted in with the diagnosis of schizophrenia. Asked whether in the case of schizophrenia there were times when the man will not know the difference between right and wrong, the Doctor said: "Certainly it very well may be. Most of the time I would say, when a man is so severely ill the diagnosis of schizophrenia is overtly present he would not know the difference between right and wrong by reason of delusions, disordered thinking, a misinterpretation of reality and the mental illness of such a severe degree that he is unable to reason logically."

On cross-examination, Doctor Sturgell said that the basic reason people develop mental illness is a lack of tolerance to stress; and that the fact that the defendant was under indictment for a serious

crime would be a stress that would affect his thinking and his symptoms, and he had been under indictment all of the time he was in the Medical Center. The Doctor stated the previous hospitalizations of the defendant had been voluntary, and that he had left the hospitals against medical advice. During the cross-examination of Doctor Sturgell, counsel agreed that a report relative to the defendant by the psychiatrist at the Veterans Administration Hospital at Topeka, Kansas, dated March 28, 1958, showed a diagnosis of "an anxiety reaction, chronic, severe, manifested by feelings of restlessness, fatigue, alcoholism, free floating anxiety and phobias"; and that a similar report about the defendant from a psychiatrist at the same hospital, dated July 26, 1957, showed: "Diagnosis: Anxiety reaction, chronic, moderate, feelings of restlessness, fatigue, alcoholism, somatizations [physical complaints referable to organs], free floating anxiety and phobias unchanged. Finding: The patient is competent." The prognosis in the report of March, 1958, was "Poor"; and the prognosis in the July, 1957, report, "Guarded". In a June, 1957, report the diagnosis was the same, the prognosis "fair", and it was also stated that the patient was "competent". Doctor Sturgell stated that psychological tests given to the defendant at the Medical Center showed him to be of average intelligence; that he had dreams of beating his wife, who had divorced him and had married his brother; that the defendant said he once had an impulse to kill her; that the tests showed him to be preoccupied in a morbid sense with suicide, hostility toward others, murder, and sexual indulgence; that his capacity for abstract thinking was about normal and he was oriented as to time, place and person. Doctor Sturgell said the defendant knew he was in a court room, knew that Mr. Benjamin was his attorney, and knew that the function of the jury was to determine his guilt or innocence of the crime of kidnapping. The Doctor stated that the fact that the defendant furnished an agent of the Federal Bureau of Investigation a true statement of the events of August 19, 1958, as shown by the evidence of other witnesses at the trial, would not indicate that he was not mentally ill; that he [the Doctor] could give no opinion as to the defendant's mental condition on August 19, 1958, but believed he was suffering from schizophrenia as of that date; and that "A person can have normal intelligence and make reasonable answers as to where he is, what he is doing and information about an occurrence, and still be seriously mentally ill with schizophrenia, misinterpret and make behaviour responses which are not normal as part of the pattern of the mental illness of schizophrenia."

Doctor John K. Dickinson, a staff psychologist at the Medical Center, testified substantially as follows: That he attended the defendant while he was at the institution for examination and treatment; that he saw the defendant four out of the five working days each week; that the defendant had quite a few unreal fears; that he had an average I.Q.; that psychological tests indicated a severe mental illness centered around his unreal fears and prior troubles; that he has schizophrenia; that "there is a good probability that he was suffering from his mental disorder schizophrenia on that date [August 19, 1958]"; and that there is a reasonable probability that at that time he did not appreciate the nature of his acts and could not distinguish between right and wrong. On cross-examination, Doctor Dickinson stated that there is a possibility that the defendant could distinguish between right and wrong at the time of the offense, and a probability that at some time during the past year the defendant did appreciate the nature and quality of his acts and had the ability to distinguish between right and wrong; and that his disease fluctuates in its symptoms and severity.

There was evidence by F. W. Porter, on behalf of the defendant, that the defendant worked for Porter, an electrical contractor, from 1949 to 1956, as a stock

man and truck driver, without missing much time; that the defendant talked of family troubles; that he had a nervous condition when he first came to work and when he quit in February, 1956; that he said he was too nervous and wanted to quit; that he also worked three or four days in December, 1957, for Porter as a truck driver, and then "didn't show up", notifying Porter that the "V. A. doctor" had advised him (the defendant) not to try to work, that he was too nervous.

The records of the Psychiatric Receiving Center, of Kansas City, Missouri, relative to the care and treatment of the defendant, were introduced in evidence on his behalf. They showed that he had been admitted to the Center for treatment from January 2 to January 4, 1956; again from March 14 to April 13, 1956; and again on December 31, 1956, when the diagnosis was: "Happy, dependent personality; potential suicide reaction depression; threats severe; family and social problem; pre-disposition severe; passive depressive personality, dependent type with alcoholic addiction."

Charles W. Harris, Field Director for the American Red Cross, in the Veterans Administration Regional Office in Kansas City, Missouri, testified relative to the defendant's applications to the Red Cross for monetary assistance, and help with family problems and hospitalization. Harris testified that he had received a letter from the defendant from the Medical Center, dated November 1, 1958, which contained this language: "I am writing to let you know that the doctors here at the Medical Center have found me incompetent. Will this affect my compensation rating? It appears to me it should be increased. Would you please write and advise me on this matter."

The defendant testified in his own behalf. He told of his family life as a boy, of the quarrels between his parents, their divorce when he was 16 years old, and of being abandoned by them at that age. He told of getting a job and being married at 17, of joining the Navy at 18, of having feelings of anxiety and being terrified and panicky which resulted in his medical discharge from the Navy in 1946, and said, "then in 1949 my wife left me and then it come on pretty bad again." He stated that he felt better between 1946 and 1949, and managed, with some difficulty, to work; that after the return of his wife in 1949, he worked for the Porter Electric Company and "made it pretty good," but at times had some pretty bad spells; that in 1956, while working for Porter, he broke a disc in his neck, and had "an awful time," and "since then it has just been getting worse and worse. At times I don't know what I am doing or where I am at." He told of going to the Kansas City Psychiatric Center in January, 1956, when he was nervous and agitated and thought of killing himself as being the only solution of his troubles. He told of going to pieces after working four days for Porter in 1956, when he (the defendant) was "chasing his boy [son]" who was staying out all night. He stated that he had gone from one hospital to another, and as soon as he got to feeling better he wanted to get out, and would try to get a job and "just fall on my face." He testified that shortly prior to the time of the offense and while in the Veterans Hospital in March of 1958, his wife went off with his brother; that he (the defendant) left the hospital and went to visit a stepfather in the country and was in such bad shape that the stepfather said, "If you are going to kill yourself, don't do it down here"; that he came back to Kansas City; that he had the feeling that he wanted to get even with his wife, and would have spells "where it was just like I was somebody else or something, I didn't know who I was or what I was doing or where I was at—it wasn't continuous but sometimes"; that this was during the Spring and Summer of 1958; that he tried to work but was unable to think where he had to go and couldn't work; that a son of his came to live with him, and broke the landlady's television; that his son would bring boys

into the house, including Dischart and Nixon, and keep them there all day while the defendant was trying to work; that his son had put it up to him that he (the defendant) would get along with his (the son's) friends or the son would run away; that he did not want to lose the boy, who was all he had left of his children; that finally, and apparently the day before the offense charged was committed, the boy let the landlady's dog out of the house, and it was killed, and thereupon she told them to leave; that the defendant had very little money, and slept in his car part of the night, was getting "an awful bad feeling" and took tranquilizers he had received from the Veterans Administration, and some whiskey. He testified that his recollection was that the next day, August 19, 1958, the two boys asked him to drive them out to Ruskin Heights to visit some girl they knew out there; that his intentions were to come back and leave them; that they saw the girl, had the defendant stop and take her in his car to the Crown Drug Store, where she was going to eat; that they asked her if she wanted to go down to "this other girl's house" when she got through, and said they would come back and pick her up; that he and the two boys drove down to the Wagon Wheel [Wheel-Inn Drive-In]; that when the time came the boys said, "Let's go back and pick her up"; that he had some more vodka and had a spell come over him after they picked her up; that he doesn't remember much more except "pulling over * * * and Dischart drove the car"; that that is all he remembers of that day until the next day; that the Government agent, in taking the defendant's statement, kept saying: "Well, the girl said this happened," and then wrote it down, and the defendant replied: "Well it evidently did because I am here and charged," and that he signed the statement. He testified that he did not remember driving the car back, and that "I must have because everybody seen me, but I don't remember that I did."

On cross-examination, the defendant testified that he did not recall where they went after Dischart took over the driving (which was before they crossed the Kansas line); that the defendant had vodka and thinks he was drinking heavily. He was asked, "When you get in your real bad condition can you drive an automobile?" His answer was: "No, I haven't been able to in the last year. When I get one of the real bad ones, I just try to get over to the side of the road. I was having spells a lot where I would get out and, well, just something— I would just kind of get in a fog or something; I was scared to drive, scared to go anywhere." He told of his domestic difficulties and of occasionally slapping his wife, and of his loss of respect for women in general, which he attributed to his wife's conduct.

At the close of the evidence, counsel for the defendant moved for a directed verdict of acquittal on the grounds of the inadequacy of the evidence to sustain a conviction of the offense charged, and the proven insanity of the defendant. The motion was denied.

■ The court refused an instruction requested by the defendant which incorporated the so-called Durham rule, which prevails in the District of Columbia, " * * * that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect." Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 874–875, 45 A.L.R.2d 1430. The court in its instructions followed substantially the test established in M'Naghten's case, 10 Cl. & Fin. 200, approved by the Supreme Court in Davis v. United States, 160 U.S. 469, 476–477, 480, 488, 492–493, 16 S.Ct. 353, 40 L.Ed. 499; Davis v. United States, 165 U.S. 373, 378, 17 S.Ct. 360, 41 L.Ed. 750, and Hotema v. United States, 186 U.S. 413, 421, 22 S.Ct. 895, 46 L.Ed. 1225, and by this Court in Voss v. United States, 8 Cir., 259 F.2d 699, 702–703. See also, Fisher v. United States, 328 U.S. 463, 467–470, 66 S.Ct. 1318, 90 L.Ed. 1382, and Leland v. State of Oregon, 343 U.S. 790, 793–796, 72 S.Ct. 1002, 96 L.Ed. 1302. Briefly stated, the M'Naghten test of insanity is insufficient mental capacity, at the time of the

commission of an offense, to understand its nature and to know that it is wrong.

That portion of the Court's charge to which counsel for the defendant directs attention reads as follows:

"Now, generally speaking, members of the jury, as I understand the evidence as it has been developed here, there are two principal defenses to the charge which has been presented against the defendant in this case. The first one is, that there was not technically a kidnapping under the statute. Very frankly, if the Government's evidence is to be believed as to the occurrence, and that is for you to determine, there can be no question but that there is a violation proved of the statute which I read to you at the beginning of this charge; but it is a matter for you to determine whether or not the evidence is as it is claimed to be by the Government. That is a matter that requires your decision.

"The other defense is, whether or not the defendant at the time of the commission of the offense was insane.

"Now, I think it is proper to tell you in this preliminary statement that in modern day usage, insanity is almost entirely a legal term. As you will have observed from the testimony of the psychiatrists who were on the stand here, they decline to use the term 'insanity' as much as they can because it is almost entirely a legal term and it has a very sharp and a very clear meaning.

"If you find that the defendant was legally insane at the time of the alleged offense, which is charged here, then you should acquit him. If you find he was not legally insane at that time, then on that issue you should find him guilty as charged.

"Now, what is insanity, the legal term 'insanity'? The term 'insanity,' as used in this defense means such a perverted and deranged condition of the mental or moral facul-

ties as to render a person incapable of distinguishing between right and wrong, or unconscious at the time of the nature of the act he is committing. That is the legal definition of the term 'insanity,' and is the test which you must apply in determining whether or not the defendant is guilty or innocent under the issue of insanity.

"I think I should tell you further that there is a presumption, so far as normal every day living is concerned, that a person is sane and in the absence of some evidence of mental illness, that presumption carries on into a court proceeding such as this one, but, under the law, where there is evidence of mental illness—notice the difference in term; I didn't say 'evidence of insanity'; I said 'evidence of mental illness'—then the presumption of sanity disappears and the Government assumes the responsibility of showing sanity or the lack of insanity, the same as any other burden that exists on it in a criminal case so far as the burden of proof is concerned.

"Now, let me say that that burden does not require that the Government prove that the defendant is not mentally ill. It simply requires that there be evidence sufficient to satisfy you beyond a reasonable doubt that the defendant is not insane within the meaning of the test that I outlined to you. I don't want to make you think that I am trying to over-emphasize it, but it is a very essential and necessary element in this case and I think, therefore, that I will re-read the definition of the term 'insanity' so that you can have it clearly in your mind.

"The term 'insanity,' as used in this case, means such a perverted and deranged condition of the mental and moral faculties as to render a person incapable of distinguishing between right and wrong, or un-

conscious at the time of the nature of the act he is committing.

"I am not going to attempt to repeat the evidence in the case precisely. I don't want you to think because I mention certain items of evidence that I am of the opinion that you should attach more importance to them than to others because, as I told you in the beginning, I don't want to try to substitute my views for yours on this. I don't want to, and to the extent that I give the impression of having an opinion, you are at liberty to disregard it. But, as I recall the testimony,—and you heard it all, so you are as well acquainted with it as I am—it is my impression that there was no direct evidence, one way or the other, by the psychiatrists or otherwise, as to whether or not this man knew the difference between right and wrong, as I have outlined it here on August 19, 1958. One of the doctors, as I recall it, said it would be impossible to make that determination as he didn't see him until quite some time after that. The other doctor, Dr. Dickson, I believe it was, indicated that there was a probability.

"Now, that simply emphasizes the predicament that you as jurors find yourselves in, in situations like this, because it is your obligation and your duty and your responsibility to make the fact determination based on the evidence as it is presented here, whether or not the man was legally insane, as I have defined it for you, at the time this incident occurred.

"Without attempting to limit your thinking in any way, because it is necessary for you to make that determination upon an examination and study of the evidence in the case, I think it would be proper for you to take into account the actions of the defendant himself immediately before and after the incident, his stated knowledge of what kidnapping might mean in his conversations with officers afterwards, the details that may have been set out in any statement that may have been made, if you find it was a voluntary and understanding statement that he made about it; his own appearance on the witness stand, and all the other aspects of the case, as I have outlined them to you. Now, again, if you got any impression from any statements that I may have an opinion about any of these matters, you should disregard it because those are matters for your determination."

The following objections and exceptions to the court's charge were taken:

"Mr. Benjamin: At this time the defendant wishes to object and to except to the following portions of the Court's charge:

"No. 1. The portion of the charge in which the Court has in effect told the jury, if you find—strike that—that there is no question of the violation proved, if you believe the evidence of the Government witnesses, because this particular portion of the charge removes from the jury's consideration, and directs a verdict on, the principal issue of guilty or not guilty and leaves only for their consideration the question of sanity or insanity, and is prejudicial to the defendant.

"No. 2. The comments of the Court on the testimony of the psychiatrists as unduly highlighting and emphasizing certain parts and not incorporating the essential elements of the psychiatric testimony, to the prejudice of the defendant, and also as re-emphasizing a thing which the defendant was unable to object to namely, the cross examination of the Government's psychiatrist by the Court himself, which is prejudicial, and in such cases is, to the defendant.

"And, finally, to the portion of the charge in which the Court summarized the evidence relating to the

question of sanity and emphasized the actions of the defendant, the knowledge of what kidnapping was, as related to the agent, the details in the statement and the appearance of the defendant.

"Those particular portions and a few others that I think are probably identified by that particular objection and exception."

■ It seems clear to us that, under 18 U.S.C. § 4244, the duty and responsibility of determining whether a defendant who has a mental illness or defect is or is not competent to stand trial is that of the trial court, and that his determination in that regard cannot be set aside on review unless clearly arbitrary or unwarranted.[1]

■ The evidence of the psychiatrists as to the competency of the defendant to stand trial was not unequivocal, and it was not shown that he was unable to understand the proceedings against him. How much mental capacity or alertness a defendant must have to be able to assist his counsel in a case where the defense is insanity, is, we think, a question of fact for the trial court. This Court has consistently ad-

hered to the policy of not requiring a trial judge to believe evidence which he finds unconvincing (Noland v. Buffalo Ins. Co., 8 Cir., 181 F.2d 735, 738; Gilligan v. Barton, 8 Cir., 265 F.2d 904, 908), and of declining to substitute its judgment for his upon issues which it is his function to determine. We are satisfied that the trial court did not commit reversible error in requiring the defendant to go to trial despite the opinion of the psychiatric staff of the Medical Center. Needless to say, expert opinion rises no higher than the reasons upon which it is based, and is not binding upon the trier of the facts. Holloway v. United States, 80 U.S.App.D.C. 3, 148 F.2d 665, 667; United States v. Fielding, D.C. D.C., 148 F.Supp. 46, 55 (reversed by a divided court, Fielding v. United States, 102 U.S.App.D.C. 167, 251 F.2d 878).

■ It is our opinion that, under the evidence at the trial, the sanity issue was one of fact for the jury and not one of law for the court, and that the defendant was not entitled to a directed verdict of acquittal. This, because the evidence as to insanity of the defendant at the time of the offense cannot be said to be so overwhelmingly one way as to compel the trial court to take the case

---

1. "§ 4244 [18 U.S.C.]. *Mental incompetency after arrest and before trial.*

"Whenever after arrest and prior to the imposition of sentence or prior to the expiration of any period of probation the United States Attorney has reasonable cause to believe that a person charged with an offense against the United States may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, he shall file a motion for a judicial determination of such mental competency of the accused, setting forth the ground for such belief with the trial court in which proceedings are pending. Upon such a motion or upon a similar motion in behalf of the accused, or upon its own motion, the court shall cause the accused, whether or not previously admitted to bail, to be examined as to his mental condition by at least one qualified psychiatrist, who shall report to the court. For the purpose of the examination the court may order the accused committed for such

reasonable period as the court may determine to a suitable hospital or other facility to be designated by the court. If the report of the psychiatrist indicates a state of present insanity or such mental incompetency in the accused, the court shall hold a hearing, upon due notice, at which evidence as to the mental condition of the accused may be submitted, including that of the reporting psychiatrist, and make a finding with respect thereto. No statement made by the accused in the course of any examination into his sanity or mental competency provided for by this section, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding. A finding by the judge that the accused is mentally competent to stand trial shall in no way prejudice the accused in a plea of insanity as a defense to the crime charged; such finding shall not be introduced in evidence on that issue nor otherwise be brought to the notice of the jury."

from the jury and direct a verdict for the defendant, although the evidence unquestionably was sufficient to place the buren of proving the defendant's sanity upon the Government.

In Davis v. United States, 160 U.S. 469, 487–488, 16 S.Ct. 353, 358, 40 L.Ed. 499, the Supreme Court said:

"Strictly speaking, the burden of proof, as those words are understood in criminal law, is never upon the accused to establish his innocence, or to disprove the facts necessary to establish the crime for which he is indicted. It is on the prosecution from the beginning to the end of the trial, and applies to every element necessary to constitute the crime. Giving to the prosecution, where the defense is insanity, the benefit in the way of proof of the presumption in favor of sanity, the vital question, from the time a plea of not guilty is entered until the return of the verdict, is whether, upon all the evidence, by whatever side adduced, guilt is established beyond reasonable doubt. If the whole evidence, including that supplied by the presumption of sanity, does not exclude beyond reasonable doubt the hypothesis of insanity, of which some proof is adduced, the accused is entitled to an acquittal of the specific offence charged. His guilt cannot be said to have been proved beyond a reasonable doubt—his will and his acts cannot be held to have joined in perpetrating the murder charged—if the jury, upon all the evidence, have a reasonable doubt whether he was legally capable of committing crime, or (which is the same thing) whether he willfully, deliberately, unlawfully, and of malice aforethought took the life of the deceased. As the crime of murder involves sufficient capacity to distinguish between right and wrong, the legal interpretation of every verdict of 'Guilty as charged' is that the jury believed from all the evidence beyond a reasonable doubt that the accused was guilty, and was therefore responsible, criminally, for his acts. How, then, upon principle, or consistently with humanity, can a verdict of guilty be properly returned, if the jury entertain a reasonable doubt as to the existence of a fact which is essential to guilt, namely, the capacity in law of the accused to commit that crime?"

In Holloway v. United States, 80 U.S. App.D.C. 3, 148 F.2d 665, 667, the court said:

"The institution which applies our inherited ideas of moral responsibility to individuals prosecuted for crime is a jury of ordinary men. These men must be told that in order to convict they should have no reasonable doubt of the defendant's sanity. After they have declared by their verdict that they have no such doubt their judgment should not be disturbed on the ground it is contrary to expert psychiatric opinion. Psychiatry offers us no standard for measuring the validity of the jury's moral judgment as to culpability. To justify a reversal circumstances must be such that the verdict shocks the conscience of the court."

It is true that appellate courts have reversed convictions in cases tried to a jury where the defense was insanity, on the ground that the Government had failed to sustain its burden of proving sanity beyond a reasonable doubt. Douglas v. United States, 99 U.S.App. D.C. 232, 239 F.2d 52, 57–60; Fielding v. United States, 102 U.S.App.D.C. 167, 251 F.2d 878, 879; McKenzie v. United States, 10 Cir., 266 F.2d 524, 527; Satterwhite v. United States, 105 U.S.App. D.C. 398, 267 F.2d 675, 676; Wright v. United States, 102 U.S.App.D.C. 36, 250 F.2d 4, 10. It is to be noted, however, that there were strong and well-reasoned dissents in Fielding v. United States, supra, and Wright v. United States, supra.

We hold that the court did not err, in the instant case, in refusing to direct a verdict of acquittal.

■ We cannot sustain the contention that the court erred in instructing the jury that if the Government's evidence was to be believed as to the occurrence which gave rise to the indictment, there could be no question that there was a violation of the statute, but that it was for the jury to determine whether the evidence was as the Government claimed it to be. Realistically, the "occurrence" was established by uncontradicted evidence and was not in dispute, and the sole question was whether the defendant lacked the mental capacity, as he claimed, to be held legally responsible for his participation in the offense.

Iu Horning v. District of Columbia, 254 U.S. 135, 138, 41 S.Ct. 53, 54, 65 L. Ed. 185, Mr. Justice Holmes, speaking for the Court, said:

"This was not a case of the judge's expressing an opinion upon the evidence, as he would have had a right to do. Graham v. United States, 231 U.S. 474, 480, 34 S.Ct. 148, 58 L.Ed. 319. The facts were not in dispute, and what he did was to say so and to lay down the law applicable to them. In such a case obviously the function of the jury if they do their duty is little more than formal. The judge cannot direct a verdict it is true, and the jury has the power to bring in a verdict in the teeth of both law and facts. But the judge always has the right and duty to tell them what the law is upon this or that state of facts that may be found, and he can do the same none the less when the facts are agreed. If the facts are agreed the judge may state that fact also, and when there is no dispute he may say so although there has been no formal agreement. * * *"

See also, Hewitt v. United States, 8 Cir., 110 F.2d 1, 10.

■ The comments of the trial court on the evidence as to mental illness in its charge to the jury, which it is argued made the trial unfair, did not, in our opinion, exceed the bounds of legitimate comment, since the court did not assume the role of an advocate or a witness and made it clear to the jury that the issue of sanity was for them to decide. The argument to the contrary is adequately answered by Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321; Glasser v. United States, 315 U.S. 60, 82, 62 S.Ct. 457, 86 L.Ed. 680; Batsell v. United States, 8 Cir., 217 F.2d 257, 262; and Esters v. United States, 8 Cir., 260 F.2d 393, 396. See and compare, Billeci v. United States, 87 U.S. App.D.C. 274, 184 F.2d 394, 402–403, 24 A.L.R.2d 881. Those cases also answer the contention that the court erred prejudicially in unduly questioning the psychiatrists who testified. See also: Simon v. United States, 4 Cir., 123 F.2d 80, 83; Burgman v. United States, 88 U.S.App.D.C. 184, 188 F.2d 637, 641; United States v. De Fillo, 2 Cir., 257 F. 2d 835, 839. The record, in our opinion, does not indicate that the trial court unfairly questioned the witnesses or improperly commented upon the evidence.

■ It is argued that it was error to admit in evidence the statement taken by the agent of the Federal Bureau of Investigation, signed by the defendant, on the morning following his arrest "and before he was taken before the United States Commissioner." The objections made at the trial to the admission of the statement were, in substance: (1) that it was cumulative and prejudicial and did not relate to the offense charged in the indictment; and (2) that, in view of the defendant's mental illness and lack of psychiatric or legal advice at the time the statement was given, it could not be termed voluntary. According to the testimony of the agent who obtained the statement, the information contained in it was voluntarily given him by the defendant after being fully advised of his rights; and, after the statement was prepared, the defendant read it and said that it sounded pretty bad but that it was true. We find nothing in the record to indicate that the trial court was asked to exclude or to strike the statement from the evidence on the ground that it was taken before the defendant was pro-

duced before a United States Commissioner. In fact, we find nothing in the record to show when or where the defendant was taken before a Commissioner. The jury were instructed that the statement was to be considered by them only if they determined it was made voluntarily and understandingly, and that if they believed it was not, then it should be disregarded entirely. This case bears little, if any, similarity to Turner v. Commonwealth of Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L. Ed. 1810, and Fikes v. State of Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246, involving confessions after prolonged coercive interrogation by police officers, of defendants of low mentality.

We find no adequate evidentiary foundation in the record for the application of the rule of the Mallory case (Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479), which dealt with a confession obtained after prolonged questioning by police from a defendant (apparently arrested without a warrant) before being taken before a committing magistrate and without being warned that he might keep silent and that any statement made by him might be used against him. This, the Supreme Court held was a violation of Rule 5(a) of the Federal Rules of Criminal Procedure, 18 U.S.C., requiring that an arrested person be taken before a committing magistrate "without unnecessary delay," and rendered the confession inadmissible. In the instant case, according to the Government's evidence, the defendant was arrested under a warrant late in the evening of August 20, 1958, and was interrogated between 8:30 and 9 o'clock the following morning. The statement was completed about 9:30 A.M. The agent who took the statement testified that he advised the defendant of his rights, at or about the time of the arrest, and said:

"I advised him I was an agent of the F.B.I.; I was telling him that he didn't have to talk to me if he didn't want to; that I would desire to take a signed statement from him but he didn't have to sign it; that he had the right to consult an attorney and that anything that he said could be used against him in a court of law at a later date."

There was no evidence as to the availability or nonavailability of a United States Commissioner prior to 9:30 A.M. of August 21, 1958.

The Supreme Court has not yet held that a statement voluntarily made by a defendant, lawfully arrested, to the arresting officer between the time of arrest and before being brought before a committing magistrate is, for that reason alone, inadmissible in evidence. Compare, United States v. Mitchell, 322 U.S. 65, 70, 64 S.Ct. 896, 88 L.Ed. 1140, and Upshaw v. United States, 335 U.S. 410, 413, 69 S.Ct. 170, 93 L.Ed. 100. There is, in the instant case, in our opinion, no adequate evidentiary basis for a ruling that the defendant's statement was induced by "illegal detention" or that there was any unnecessary delay in producing him before a United States Commissioner, or that the statement was the "fruit of wrongdoing" by the arresting officer, as in Upshaw v. United States, supra, at page 414 of 335 U.S., at page 172 of 69 S.Ct., or the result of pressure while in custody, as in Watts v. State of Indiana, 338 U.S. 49, at page 53, 69 S. Ct. 1347, at page 1350, 93 L.Ed. 1801, in which it was said:

"A statement to be voluntary of course need not be volunteered. But if it is the product of sustained pressure by the police it does not issue from a free choice."

■ The evidence sought to be elicited by the defense with respect to the possibility of involuntary confinement and treatment of a person such as the defendant under civil commitment, was, we think, irrelevant and was not improperly excluded.

■ The trial court's statement to the entire jury panel at the opening of the trial, which is complained of as inaccurate and unfair to the defendant, was merely to give the panel some idea

as to the nature of the case. It is not conceivable that the trial jury, after hearing the evidence, could have been misled or influenced by any inaccuracy in that statement.

Government counsel, during his closing argument to the jury, pointed out that, under Federal law, there could be no verdict of "not guilty by reason of insanity," and said of the defendant: "He is either guilty or not guilty, and if not guilty he walks out that front door. Mr. Scheufler can't stop him, the Judge can't stop him, Dr. Sturgell can't take him back to the Medical Center. That is the end of it so far as the law is concerned. So I want to make it clear that there is only two verdicts."

It is contended that that statement and two others—one about the defendant being preoccupied with "hostility, murder, suicide," and "sexual indulgence," and the other about being "a man who is pretty dangerous"—constituted such misconduct on the part of the prosecution in final argument as to call for a reversal of the conviction.

 The evidence justified the statement that the defendant was dangerous and preoccupied as counsel for the Government said he was. Whether the statement that if the defendant were acquitted, any of the persons mentioned by counsel could have prevented his leaving the court room by the front door and that the case would be ended, is perhaps debatable, but to base a reversal on that statement, which was not objected to, would be clearly unwarranted. Moreover, it is vitally important in any case that a statement of counsel, in a closing argument to the jury, deemed to be improper, be called to the attention of the court either at the time it occurs or at the close of the argument.

In London Guarantee & Accident Co. v. Woelfle, 8 Cir., 83 F.2d 325, at page 344, this Court said:

"The exceptions to the argument, if made at its close, should call attention to the substance of each remark of which the party excepting complains, so that the court will be given full opportunity to take appropriate action to cure the misconduct and thus avoid a new trial, and so that the appellate court, if an appeal is taken, may know exactly what the appellant complained of upon the trial."

 So far as the question raised by the objection to the court's refusal to give the instruction based upon the Durham rule is concerned, that is answered by our decision in Voss v. United States, 8 Cir., 259 F.2d 699, 702–703, where the same question arose.

The wisdom of prosecuting the defendant in federal court under the Federal Kidnapping Act, 18 U.S.C. § 1201, in view of what was said by the Supreme Court in Chatwin v. United States, 326 U.S. 455, 463–464, 66 S.Ct. 233, 90 L.Ed. 198, is no concern of this Court. In our opinion, it was the duty and responsibility of the trial court to determine whether the defendant was competent to stand trial, and it was for the jury to decide whether, under the evidence, there was a reasonable doubt as to the defendant's sanity at the time the offense was committed. We think that nothing occurred at the trial which would justify this Court in reversing the judgment appealed from. Counsel for the defendant sincerely believes that the defendant was conclusively shown to be incompetent to stand trial, that at the trial the Government failed to sustain its burden of proving beyond a reasonable doubt that he was sane when the offense was committed, and that because of his severe mental illness a serious injustice has been done him. The questions raised are not entirely free from doubt. Our views as to the test of insanity and as to when a defendant who asserts that defense is entitled to a directed verdict do not conform with the more recent views of the Court of Appeals of the District of Columbia Circuit. It would, no doubt, be helpful if the Supreme Court would grant certiorari in this or some similar case and clarify the law relating to the test of insanity, the quantum of evidence

required to meet the burden of proof of sanity, and other aspects of the problem.

The judgment appealed from is affirmed.